1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3    _____
                                    )
4    MARK PRICE,                    )      No. 20-CV-01099-DHU
              Plaintiff,            )
5                                   )
        vs.                         )      Mimbres Courtroom
6                                   )      Albuquerque, New Mexico
     FRANCIS WHITTEN,               )
7    THADDEUS ALLEN, and            )
     THE CITY OF LAS CRUCES d/b/a   )
8    THE LAS CRUCES POLICE          )
     DEPARTMENT,                    )
9              Defendants.          )      November 28, 2023
     _____)      10:11 a.m.

10

11                 TRANSCRIPT OF PROCEEDINGS
                        MOTIONS HEARING
12         BEFORE THE HONORABLE DAVID HERRERA URIAS
             UNITED STATES DISTRICT COURT JUDGE
13
     APPEARANCES:
14
     For the Plaintiff:   MOLLIE C. McGRAW, ESQ.
15                        McGraw & Associates, LLC
                          165 West Lucero
16                        Las Cruces, NM  88005

17                        SHANNON L. KENNEDY, ESQ.
                          Kennedy Law Firm
18                        1000 Second Street, NW
                          Albuquerque, NM  87102
19
     For the Defendant:   TAYLOR S. RAHN, ESQ.
20                        Robles, Rael & Anaya
                          500 Marquette Ave., NW
21                        Suite 700
                          Albuquerque, NM  87102
22

23   REPORTED BY:         CARMELA V. McALISTER, CRR, RPR, NM CCR 308
                          United States Court Reporter
24                        333 Lomas Blvd., NW
                          Albuquerque, New Mexico  87102
25                        Phone:  505-248-2094
                          Email:  Carmela_McAlister@nmd.uscourts.gov

1                          <u>TABLE OF CONTENTS</u>

2    Court in Session                                       3

3    Doc. 193
         Argument by Ms. Kennedy                         5
4        Response by Ms. Rahn                            9
         Reply by Ms. Kennedy                           19
5    Doc. 123
         Argument by Ms. McGraw                         29
6        Response by Ms. Rahn                           31
     Doc. 151
7        Argument by Ms. McGraw                         35
         Response by Ms. Rahn                           40
8        Reply by Ms. McGraw                            42
     Docs. 120 and 121
9        Argument by Ms. McGraw                         45
         Response by Ms. Rahn                           48
10       Reply by Ms. McGraw                            53
     Doc. 122
11       Argument by Ms. McGraw                         55
     Doc. 124
12       Argument by Ms. McGraw                         56
         Response by Ms. Rahn                           58
13       Reply by Ms. McGraw                            60
     Doc. 127
14       Argument by Ms. Rahn                           62
         Response by Ms. Kennedy                        65
15       Reply by Ms. Rahn                              71
     Doc. 128
16       Argument by Ms. Rahn                           79
         Response by Ms. McGraw                         88
17       Reply by Ms. Rahn                             100
     Doc. 129
18       Argument by Ms. Rahn                          114
         Response by Ms. McGraw                        115
19       Reply by Ms. Rahn                             117
         Surreply by Ms. McGraw                        121
20   Doc. 131
         Argument by Ms. Rahn                          126
21       Response by Ms. Kennedy                       129

22   Certificate of Official Court Reporter            135

23

24

25

1    COURTROOM DEPUTY:  United States District Court for the

2  District of New Mexico is in session, the Honorable David Herrera

3  Urias presiding.

4    THE COURT:  Please be seated.

5    Good morning, everyone.  We're here on several motions this

6  morning.  This is Price v. Whitten, 20-CV-01099.

7    We have, by my count, at least 12 motions that we need to get

8  through today.  Trial, I think, is set for now -- or tentatively

9  set for January, late January of 2024, and so we wanted to get

10  these out of the way.  I'll ask first if -- I have not gone back

11  to see if there's been any movement in the Tenth Circuit.  I know

12  the briefing was done on that issue regarding the jurisdiction.

13    Anything happening, Ms. Rahn?

14    MS. RAHN:  No, Your Honor.  Our brief was filed on the

15  22nd.  I believe Plaintiff's response is due in early December, so

16  we haven't had any word from the Tenth Circuit.

17    THE COURT:  Okay.  We're still waiting for the briefing

18  to be completed.

19    Well, then, let's go ahead and move forward with these,

20  unless somebody has any thoughts on how we should proceed with the

21  pending motions.  I guess I should first ask if any them are now

22  moot or have been determined by the parties to be something

23  they're not going to pursue.

24    MS. RAHN:  Your Honor, as I noted previously, our motion

25  in limine No. 3, which is Docket No. -- excuse me, Docket No. 129,

1  our motion in limine to exclude the outcome of the criminal
2  charges, we withdraw that.
3          THE COURT:  All right.  I'll have that taken off.  Any
4  others on the Plaintiff's end that are no longer being pursued for
5  any reason?  No?
6          MS. KENNEDY:  No, Your Honor.
7          THE COURT:  All right.  Basically we have ten motions --
8  or now nine motions in limine, and now we have the other motions.
9  So let's start off with the other motions.  With regard to 193,
10 this is Doc 193, this is Plaintiff's motion to instruct jury on
11 punitive damages and to resolve the <u>Dunton</u> conflict between the
12 Defendants Francis Whitten and the City of Las Cruces.  So let's
13 hear from whoever's arguing it on behalf of the Plaintiff.
14         MS. KENNEDY:  I'll be arguing on behalf of Plaintiff,
15 Your Honor.
16         THE COURT:  Thank you, Ms. Kennedy.
17    I guess I should get your appearances, too.  I didn't get to
18 that.
19         MS. KENNEDY:  Shannon Kennedy and Mollie McGraw on
20 behalf of Mr. Price, who is at the table.
21         THE COURT:  All right.  Good to see you all.
22         MS. RAHN:  Taylor Rahn on behalf of the City Defendants,
23 Your Honor.
24         THE COURT:  Good to see you as well, Ms. Rahn.
25    Ms. Kennedy?

1    MS. KENNEDY:  Your Honor, I will begin with Plaintiff's

2 motions for punitive damages as it is linked to the Dunton motion.

3 As Plaintiff articulated in his reply, the concern is that

4 pursuant to the New Mexico Tort Claims Act, if there is a finding

5 of punitive damages against an individual officer, a municipality

6 has the ability to seek subrogation.  And our concern with the

7 waiver filed by Officer Whitten in this matter is it does not

8 address potential conflicts arising at trial when the jury,

9 pursuant to the evidence as Plaintiff understands it will unfold,

10 is instructed on punitive damages.

11    In Defendant's response, they say not every Fourth Amendment

12 violation does a punitive damages instruction make.  However, in

13 this case, there is ample evidence of malice towards Mr. Price,

14 evidenced both on the body worn camera where he is unarmed,

15 defenseless, arms in the air, saying yes, sir, exercising his

16 constitutional rights, and tased for 13 seconds in the testicle.

17 This form of torture merits a punitive damages instruction.  And

18 our police procedures expert, Scott DeFoe, will testify that

19 officers are trained to reassess a need of use of force for every

20 five second pull of the trigger.  There is no explanation for a 13

21 second electric -- first of all, there's no reasonable explanation

22 for tasing someone in the testicle in their strike zone, but once

23 tased, the officer's failure and continued electrocution of

24 Mr. Price is grounds for a punitive damages instruction.

25    The case that we have submitted as most analogous and most

 1   recent was a cause against LCPD in front of Justice Gonzales, and
 2   that is the <u>Beck v. Baker</u> case, in which a woman similarly was
 3   unarmed and defenseless and a victim of excessive use of force.
 4        In addition to a jury being given an opportunity to punish
 5   and deter gratuitous and sadistic uses of force with a taser, we
 6   also have here a claim for malicious abuse of process in which
 7   there was no evidence that Mark Price committed a crime, and yet
 8   he was prosecuted for resisting arrest, and that there was no
 9   legitimate purpose for this prosecution other than to punish him
10   for exercising his constitutional rights.
11        That's --
12        THE COURT:  Does just bringing a claim for malicious
13   abuse of process, is it your position that that, in itself, calls
14   for a punitive damages instruction?  Or are there not some cases
15   where a claim like that could succeed absent reckless conduct or
16   malice or willfulness on the part of an officer?
17        MS. KENNEDY:  There may be some cases where an officer
18   has a good faith belief that the prosecution is notorious, and
19   those cases would probably have to be subjected to qualified
20   immunity.  In this case, because the law was so clearly
21   established, one has to have an underlying crime to prosecute
22   resisting arrest.  I mean, in this matter, there is evidence of
23   officers discussing the arrest of Mark Price because he was,
24   excuse my language, a pain in the ass, that there is evidence of a
25   discussion and decision to punish him for his -- for his assertion

1    of his constitutional rights as opposed to bringing a criminal to

2    justice.  So, certainly, I could imagine a situation where a

3    prosecution lacks probable cause but an officer genuinely doesn't

4    know that he's done something wrong.  In this case, we have

5    evidence of intentional and malicious use of the criminal justice

6    system, misuse of the criminal justice system, to deter the

7    exercise of constitutional rights and to punish, immediately

8    punish Mr. Price for his assertion.

9         THE COURT:  All right.  And I assume that your argument

10   concerning the conflict -- it sounds like your argument concerning

11   the conflict would only come up if the Court was to say, at this

12   point in time, that we would be giving the jury instruction of

13   punitive damages to the jury?  Is that the only time the conflict

14   would come up, is if the jury instruction on punitive damages was

15   to be given to the jury?

16        MS. KENNEDY:  No, Your Honor.  I think that there is a

17   connection, and we linked them for that reason, because there has

18   been no specific evidence that Officer Whitten has been advised

19   that, you know, if a judgment is entered against him, even for

20   compensatory damages, that it could adversely impact his credit.

21        What we have in this case that creates the conflict, which is

22   somewhat unusual, is we have the lack of a motion to bifurcate

23   these cases.  So we're going to have evidence that his defense is

24   I was only following policy.  I was following the SOP.  I'm not

25   malicious.  I was not trained properly.  I truly believed that I

1    could arrest people and demand identification if I had belief that

2    this could be a verbal dispute a/k/a a domestic disturbance.  And

3    we will be arguing that that isn't true, that that's unreasonable,

4    that that's an excuse that he's using, like he uses jaywalking

5    later as an excuse to rationalize his unconstitutional conduct.

6        The concern is that Ms. Rahn would be in a position, because

7    of negligent supervision, negligent training, because of the

8    comparative fault in the tort claims in this matter, as well as

9    the Monell claim, of being put in a position where she might have

10   to cross -- softly cross-examine Officer Whitten on his knowledge

11   of these policies.  And so our concern is that the conflict waiver

12   says, you know, currently you are waiving the conflict.  We've

13   advised you that we represent both the City of Las Cruces and you

14   as an individual, and I have currently waived this conflict.  But

15   paragraph 4, paragraph 5, says, you know, if a conflict arises,

16   you are free to seek independent counsel.  Well, we don't want to

17   be in the middle of trial and have, you know, Ms. Rahn or her

18   client say, I now perceive there could be a conflict because

19   Sergeant Allen or Whitten contradict one another.  So those are

20   the general concerns.

21       Mostly we're concerned if we get a verdict, pursuant to

22   Dunton, we could lose the verdict if we don't raise these issues.

23   And so we appreciate the City of Las Cruces has provided a waiver.

24   We just want to put on the record so that when we get a judgment,

25   whether it's compensatory or punitive, it is not challenged on

1    appeal.

2         THE COURT:  What is it that you're asking me to do?  It

3    sounds like you're asking me to find that there is a conflict just

4    straight out, given the waiver that's been presented by the

5    defense, and then do what?

6         MS. KENNEDY:  And decide whether that conflict is

7    waivable, and I believe the defense believes the conflict is

8    waivable.

9       We don't disagree the conflict is not waivable.  We just need

10   a record that the Court and parties agree it's a waivable

11   conflict.  We want to proceed with Ms. Rahn as competent counsel,

12   but we also want to protect any verdict that we get from

13   challenges to that verdict saying that Officer Whitten unknowingly

14   was bamboozled into not seeking independent counsel or advice.

15        THE COURT:  All right.

16        MS. KENNEDY:  Thank you, Your Honor.

17        THE COURT:  Thank you, Ms. Kennedy.

18      Ms. Rahn?

19        MS. RAHN:  Your Honor, because Ms. Kennedy left off with

20   the conflict, I will start there.

21      As the Court is aware, we did submit a waiver.  It is a

22   standard form of waiver that we have used in multiple other cases,

23   and the Courts have previously held that that's a sufficient

24   waiver for this type of tension between following policy, as well

25   as the officer's actions.  And I want to clarify what we expect

1   the evidence to be.

2       In this case, during his deposition, Officer Whitten

3   mentioned that he thought he had to get -- or that he needed to

4   get the names of people involved in a domestic disturbance.  He

5   never stated he believed that that allowed him to arrest

6   individuals without probable cause, nor did he state that he

7   believed that meant he could detain them without reasonable

8   suspicion.  At no point has he said that I thought I was doing the

9   right thing because of the policy.  Officer Whitten has

10  articulated why he believed he had reasonable suspicion to give

11  Mr. Price commands to detain him based upon the information

12  available to him, as well as why those lawful commands provided

13  probable cause for him to arrest Mr. Price under the resisting,

14  evading, obstructing statute.

15      So the allegation that Officer Whitten will get on the stand

16  and say, I thought I could arrest people without probable cause

17  because of Las Cruces PD's policy, that's never been what he's

18  stated in this case.  He's never stated that he believed the

19  policy supplanted the ordinary Fourth Amendment justifications for

20  interactions with citizens.

21      Additionally, I think there's been a number of parsing's out

22  of the idea of a domestic disturbance, which could be a

23  verbal-only discussion, but there's also an actual what he thought

24  was a potential crime of domestic violence, which would include

25  some touching.  So I don't think that the evidence, as represented

1   by Ms. Kennedy, is exactly the way we believe it's going to play

2   out.

3       One of the requests that Plaintiffs made in their motion

4   regarding this conflict was to prohibit defense counsel from

5   cross-examining Mr. -- excuse me, Officer Whitten about this

6   issue.  Because this is a civil case and Plaintiff is entitled to

7   call whomever he wishes in his case-in-chief, it's quite likely

8   that Plaintiff will call Officer Whitten in his case-in-chief and

9   defense's examination of their own client would occur during

10  Plaintiff's case.  So that will be a cross-examination, although

11  it will really also be my direct examination just because of the

12  way civil trials play out.

13      The Court should not rule that we cannot question Officer

14  Whitten about that.  It's not a manner adverse to his interests.

15  It's not his assertion that he believed LCPD trained him he didn't

16  need probable cause.  So prohibiting counsel from engaging in that

17  discussion is inappropriate because we will just be clarifying his

18  understanding of the policy, as well as understanding that that

19  did not alter the ordinary justification for interactions with

20  citizens.

21      In regards to Ms. Kennedy's concern about a future conflict,

22  we have to be careful in protecting our actions under the rules of

23  ethical responsibility that we do address future conflicts.  We're

24  not attempting to sandbag anyone at trial.  However, if Officer

25  Whitten were to say something unexpected or Sergeant Allen were to

1   say something unexpected, we do have to preserve that right in the

2   future.  So I'm not aware of any specific evidence that I

3   anticipate coming out, but it is something we have to be aware of.

4       This issue was raised specifically in regards to Officer

5   Whitten.  However, we do have a conflict waiver from Sergeant

6   Allen as well.  I just wanted to make the Court aware because he

7   does have his separate interests in this case.  So the City has

8   waived the conflict.  Officer Whitten has waived the conflict, and

9   Sergeant Allen has waived the conflict.

10      I do also want to note -- it sounds like the Court is

11  interested in entertaining this issue, but I do want to note, from

12  the beginning of this case, although several different defense

13  counsel entered, all three Defendants have been continuously

14  represented by the same attorney.  So this issue did not arise

15  solely at the end of the case.  It's been present for the entirety

16  of the case.  And I recognize counsel's interest in protecting a

17  verdict now that we're closer to trial, but want to clarify this

18  isn't a specific conflict with my firm.  It has been present in

19  the fact that defense counsel has always represented all three

20  Defendants.  Our firm specifically got conflicts for our purposes.

21  I cannot speak to what prior defense counsel either told or did

22  not tell or waivers they got, but we felt like our firm needed

23  those waivers.

24      So all in all, Your Honor, we have a waiver from the City.

25  We have a waiver from Sergeant Allen.  We have a waiver from

1    Officer Whitten.  As we sit here today, I have no information that
2    the testimony is going to shake out the way that counsel suggested
3    it might in terms of a cross-examination of Officer Whitten
4    because he's never represented that he simply detained Mr. Price
5    solely because of this policy.  He explained why he thought he had
6    reasonable suspicion, and then had that discussion with Sergeant
7    Allen.  I just wanted to clarify that, Your Honor, about the
8    number of waivers in this case.

9          THE COURT:  What do you think of Plaintiff's position
10   that -- or their request that the Court find the conflict to be
11   waivable?

12         MS. RAHN:  Your Honor, I believe that it is appropriate
13   in certain circumstances for the Court to manage its own docket
14   and ensure that we don't have an issue further down the road, so I
15   don't think that's outside the Court's control.  I don't agree
16   that there is a conflict.

17         THE COURT:  We have a <u>Monell</u> issue here as well that
18   we're going to be trying in this case?

19         MS. RAHN:  Yes, Your Honor.

20         THE COURT:  So I can see a situation where there might
21   be a conflict.  I mean, it's not speculative, I don't think, to
22   imagine that there's going to be some -- or could be some
23   testimony when you have a case against the City, as well as a case
24   against an individual officer.

25      What happens, for instance, if the City makes a claim or

1   there's some implication that he was acting outside the scope of
2   his duty or that he was not acting in a way that was conducive or
3   appropriate with regard to their policies?

4         MS. RAHN:  So the City has absolutely waived any
5   argument that he was acting outside the scope of his duties to the
6   extent that he was not acting under the color of state law or
7   within the waiver asserted by the New Mexico Tort Claims Act.  So
8   that's the first part of the Court's question.

9         The second part, in terms of the allegation that Mr. --
10  Officer Whitten was acting in violation with LCPD's policy, when
11  the Court reviews the exhibits, as well as the witnesses that were
12  disclosed in this case, Plaintiff did not intend to call any of
13  the administration from the Las Cruces Police Department.  So, for
14  example, the current police chief or the police chief at the time
15  was not -- is not a witness in this case.  So the Monell claim is
16  actually based solely upon this idea of this unofficial policy or
17  official policy to the extent Plaintiffs argue that it's codified
18  in the SOP, and a simple comparison of that.  So there is no --

19        THE COURT:  Remind me, what's the policy?  Is it the
20  policy of getting everyone's identification even in cases where
21  there might be reasonably a crime had been committed or a domestic
22  issue or something to that effect?

23        MS. RAHN:  That's the Plaintiff's assertion of what the
24  policy says.  It's obviously not our position that it supplants
25  the constitutional standard.  But, yes, that's Plaintiff's

1   argument, that Officer Whitten testified that he had to get

2   individual contact names on domestic disturbances.  Again, that

3   was one statement made in his deposition in light of the

4   whole justification, which was specifically reasonable suspicion

5   and then probable cause to arrest officer -- or Mr. Price, rather.

6       So I just want to point out, Your Honor, that originally in

7   the exhibits, no policy, no written policy, was actually produced.

8   When the Court pushed the trial back to January, Plaintiffs

9   submitted a new exhibit list with a policy regarding

10  investigations that we object to because it was not part of the

11  original production, and, obviously, we'll eventually get to

12  objections to exhibits.  But as the universe of facts regarding

13  the Monell claim, as I understood them, was simply going to be

14  Officer Whitten's testimony.  Again, Sergeant Allen has waived the

15  conflict, and at this point, I have no information that Sergeant

16  Allen is going to say Officer Whitten did something different than

17  the policy.  Again, Sergeant Allen's actually being sued for his

18  involvement in giving Officer Whitten advice about how to proceed

19  with the criminal charges.

20          THE COURT:  When you say you have no information that

21  he's going to be saying anything different with regard to the

22  policy, how do you have no information?  You're the one that's

23  going to present him as a witness, I suppose.  So do you

24  anticipate getting testimony from Sergeant Allen that Defendant

25  Whitten was working or violated or was not in compliance with any

1   of the policies of LCPD?

2           MS. RAHN:  I do not, Your Honor.  I apologize if my

3   statement was inartfully stated.  That's exactly what I meant.  As

4   I stand here today, I don't expect anybody to say that.  I just

5   can't guarantee what everyone's going to say at trial.

6           THE COURT:  All right.  How about the punitive damage

7   issue, the jury instruction?

8           MS. RAHN:  Yes, Your Honor.  So in addressing that,

9   Plaintiffs continually rely on the fact that Officer Whitten

10  allegedly violated Mr. Price's Fourth Amendment rights.  And as we

11  cited, the Tenth Circuit case law actually says that in

12  considering punitive damages, the fact that the officer violated

13  the rights is not the determining factor of whether or not

14  punitive damages are appropriate.

15      Throughout the briefing and also today, Plaintiffs have

16  argued that punitive damages are necessary because of Officer

17  Whitten's later deposition testimony that an additional crime was

18  potentially jaywalking.  There's no evidence, there's no case law

19  that indicates that that would support an award of punitive

20  damages.  In fact, it appears that Plaintiff is arguing that

21  because Officer Whitten has not agreed to accept liability for

22  Fourth Amendment claims, that the fact that he has put up a

23  defense to this lawsuit supports punitive damages.  That is an

24  inappropriate reading of the case law.

25      They say Officer Whitten hasn't taken responsibility for

1    these constitutional violations.  Officer Whitten doesn't believe
2    that he violated Plaintiff's constitutional rights.  He has an
3    argument in this case, which he's entitled to present, that he did
4    not violate Mr. Price's constitutional rights.  So using that,
5    basically, failure to accept responsibility against him to support
6    punitive damages is inappropriate and there's absolutely no case
7    law that supports the idea that if a Defendant does not simply
8    accept the verdict against him, punitive damages are warranted.

9         Plaintiff has also cast the discussions with Sergeant Allen
10   as a way to fabricate evidence after the fact.  There's no
11   evidence that Officer Whitten told Sergeant Allen anything that
12   was untrue about the facts that led up to Mr. Price's arrest.  As
13   a matter of fact, that shows good faith to try to confer with
14   another officer.  Some of the statements about Mr. Price -- I
15   think counsel was alluding to the idea that there was implicit in
16   that a discussion to punish Mr. Price.  There was obviously no
17   explicit discussion that Mr. Price deserved to have false charges
18   pressed against him simply because he hadn't been cooperative.
19   Officer Whitten explained the situation.  As we've argued before
20   the Court multiple times, there was an actual 911 phone call which
21   did indicate that the calling party was concerned for Lorenza
22   Ledezma's safety.  Officer Whitten did not fabricate that out of
23   whole cloth.  And, again, the case law, Your Honor, requires
24   something more than the fact that there was an arguable or, if the
25   Court finds, that there's a constitutional violation.

1    The Plaintiff also makes inappropriate arguments about

2    punishing LCPD.  So they mention <u>Beck v. Baker</u>, a case in which

3    the Las Cruces Police Department -- there was a jury award against

4    another Las Cruces Police Department officer, and they argued that

5    the Las Cruces Police Department ignored the jury's message in

6    that verdict and continued with its practices.  Punitive damages

7    are not appropriate against the Las Cruces Police Department, and

8    there's no tying that case to Officer Whitten in the idea that he

9    has somehow needed such exceptional deterrence because of a

10    previous filing against the Las Cruces Police Department.  There

11    are no punitive damages available against LCPD.  There are no

12    punitive damages available under the Tort Claims Act.

13    So we are just here about the claims under the Fourth

14    Amendment.  And there's simply no evidence that Officer Whitten

15    acted in an unusually reckless -- with reckless disregard.  In

16    fact, he confirmed the information with his supervisor.  He also

17    took the additional step of attempting to speak to the calling

18    party, as well as Ms. Ledezma.  And it's undisputed that as

19    Officer Whitten was speaking to Ms. Ledezma, Mr. Price approached

20    the scene.  And so that's been characterized as Officer Whitten

21    hanging up on Ms. Ledezma, but he turned his attention to

22    Mr. Price and did attempt to ask him questions.

23    In regards to the allegation of excessive force, there's

24    numerous allegations about the fact that Mr. Price was tased in

25    the genitals.  There's absolutely no evidence that that is -- that

1    that was intentional in any way.  As a matter of fact, I believe

2    Officer Whitten testified that he did not intentionally target the

3    genitals.  I believe that Officer Whitten will testify that tasers

4    are not always accurate in terms of deploying the prongs, in terms

5    of tasing.  That is a universally-accepted fact in police

6    procedures, and I believe even Plaintiff's expert will have to

7    concede that point, that the aiming -- the precision of taser

8    aiming is not always 100 percent accurate.  And there's no

9    evidence that Officer Whitten, for example, laughed or made light

10   of or said anything about intentionally tasing Mr. Price in the

11   genitals.  So the mere fact that that happened is not enough to

12   support punitive damages in this case.

13            THE COURT:  Okay.  Thank you, Ms. Rahn.

14            MS. RAHN:  Do you have anything further, Your Honor?

15            THE COURT:  No, not at this time.

16       I'll hear from the Plaintiff on rebuttal.

17            MS. KENNEDY:  Thank you, Your Honor.

18            THE COURT:  Now, I think the defense is correct in that

19   just because there's a violation of the Fourth Amendment right,

20   even if the jury was to find -- if we ever get there, if the jury

21   was to find that the officer violated the Plaintiff's

22   constitutional rights, that doesn't necessarily mean that he's --

23   they're entitled -- the Plaintiff is entitled to a jury

24   instruction on punitive damages.  Is that correct?

25            MS. KENNEDY:  That's correct, Your Honor.  We absolutely

1    agree with that.  It's a red herring, because that's not the case
2    that the Court has or the jury will hear.

3        In this case, our police procedures expert will testify that
4    three cycles under this context is sadistic and malicious.  And
5    there is case law from the last 20 years of the abusive use of the
6    taser, which we will argue this was.  And her defense is not --
7    her defense was this can happen.  Our defense is this was reckless
8    and intentional.  This officer arrives on the scene and, instead
9    of deescalating within the escalation, within two minutes and 39
10   seconds has tased someone in the genitalia while another officer
11   is pointing a gun at him.  And so we believe that the community
12   should decide whether that kind of abuse should be deterred.

13       It's funny because in motions in limine, one kind of has to
14   show one's hand, and counsel has said that we've provided new
15   exhibits, potential exhibits, one of which is on LCPD's website,
16   which is their policy in relation to domestic disturbances, which
17   corroborates the deposition testimony of Officer Whitten.  I think
18   it's important to note that counsel for LCPD, Officer Whitten and
19   Officer Allen talked about reasonable suspicion and probable
20   cause, but not of a crime.  And that is the link that causes the
21   problem, is that this officer is detaining people without
22   reasonable suspicion of a crime.  This was a call for a welfare
23   check of another woman.  He admits in his deposition, when asked:
24           "When you arrived at the scene, was there any evidence
25        at the scene of the home itself to suggest that a crime had

1    been committed?"

2         Officer Whitten:  "No."

3         "Anything that you had in your knowledge at the point

4    that you arrived on-scene that there was any evidence of

5    wrongdoing?"

6         "I wouldn't necessarily say wrongdoing, but we do have

7    to take reports reference to domestic disturbances, and based

8    on the information I received, from the phone call I made

9    once I arrived on-scene, I was able to determine that it was

10   going to be a domestic disturbance or it could potentially be

11   a domestic disturbance, and that I was going to be

12   investigating rather than just a welfare check."

13       There is no evidence of a crime.  His defense is domestic

14   disturbance, that I needed to detain this man when there was no

15   crime pursuant to LCPD policy.  So the, oh, we don't know how this

16   is going to work out at trial, well, clearly he will be, if he

17   changes his testimony, cross-examined by Plaintiff's counsel on

18   his excuse, which is I had to -- I had to stop this man, and I had

19   to order him to get down on the ground, and I had to tase him

20   because I was investigating a welfare check that I thought it was

21   a domestic disturbance.  No, it's not a crime, not even

22   wrongdoing, but I'm going to use force.  And I'm not just going to

23   say, Sir, don't move, or, sir, how are you doing?  I'm not going

24   to talk to you.  I'm not going to deescalate you.  I'm not going

25   to say, Hey, how are you?  I'm going to order you to get down on

1   the ground, point a taser at you, point a gun at you, and cycle a

2   taser for 13 seconds. That's outrageous. This is America. He

3   had the freedom to say, No, sir, I don't want to talk to you.

4       This is an officer that won't take no for an answer, and

5   instead of deescalating and communicating like an objectively

6   reasonable officer, which Scott DeFoe will explain what a normal

7   officer would do, this officer abused this man. And then

8   on-scene, on camera they say, He's not calming down. Take him to

9   jail. That's outrageous. That doesn't happen in America, and a

10  jury should be able, as the conscience of our community, to punish

11  and deter this officer as an example to others.

12      So another red herring argument is, oh, they think they can

13  get punitive damages against LCPD and, no, they can't. Well, we

14  know that. We are not trying to get punitive damages against this

15  police department. But what we will say to this jury is, You have

16  to deter this officer because they won't. They won't supervise

17  them. They won't train them. They won't tell an officer this is

18  outrageous behavior.

19      So this isn't about someone who oopsie-doopsie tased someone

20  for so long. This is about a man who thinks he can abuse someone

21  and get away with it because the police department allows him to

22  do it. And we are going to tell the jury to deter him, to do the

23  job they don't do, award punitive damages, because otherwise no

24  one is safe. And that's what that's about.

25              THE COURT: Why do we need a pretrial decision on this?

1    Why are you asking me to decide this now?  Obviously, we have jury
2    instructions that we've been working on.  We're going to continue
3    to work on them as we proceed to trial.  And, ordinarily, during
4    civil cases, we'll be working on them every day before it
5    actually gets to -- before we actually charge the jury.  Doesn't
6    it make sense to determine -- or for the Court to determine
7    whether or not that instruction would be appropriate after we've
8    heard how the evidence actually comes in.  I know we have
9    depositions but, as you know, things that are said in depositions
10   don't always end up being admitted at trial.  And so why wouldn't
11   the Court wait to see how the evidence plays out at trial before I
12   determine whether or not a jury instruction on punitive damages is
13   appropriate?
14       I'll tell you now that in the civil cases that we've had so
15   far in this Court -- obviously, we've only had two years of
16   trials -- but so far, the civil cases, both of those, we've waited
17   until we've determined how the evidence played out at trial to
18   determine the appropriateness of a jury instruction on punitive
19   damages.
20           MS. KENNEDY:  Your Honor, certainly we understand the
21   Court does not have to rule on whether he's going to instruct on
22   punitive damages now.  The context of the jury instruction on
23   punitive damages was to put in place why the Dunton motion is
24   being raised now, to anticipate and let the Court know counsel is
25   right, the Dunton conflict has existed since the time of the

1    filing of this complaint but only ripened when we realized we'd be

2    at trial both on municipal liability, tort claims against both the

3    City and individual officers, and Officer Whitten.

4             THE COURT:  What do you make of the defense's, I guess

5    their commitment to saying or at least they've stated to the Court

6    that they don't anticipate testimony being that Officer Whitten

7    acted in violation of any LCPD policies or that he acted outside

8    the scope of his duty as an officer?  Doesn't that resolve some of

9    the issues that you were concerned with regarding the conflict?

10             MS. KENNEDY:  Certainly it does, Your Honor.  And we

11   appreciate them acknowledging that at all times he was acting

12   within the scope of his duties.  And certainly that -- and that

13   creates what could be a conflict.  It mutates it into a waivable

14   conflict.  So we appreciate that.  Because in the past, LCPD has

15   alleged officers acted outside of the scope of their duties when

16   they engaged in criminal conduct such as sexual assaults or in

17   this case a criminal battery.  So we raise this issue so we have a

18   record in case an appellate counsel wanted to raise a Dunton

19   conflict on appeal, so we know that our verdict is safe.  We

20   anticipate there could be a large punitive damages award and

21   that's why we contextualize our Dunton motion with the punitive

22   damages instruction arguments knowing that the Court, of course,

23   does not have to rule now on whether there should be a punitive

24   damages instruction.

25             THE COURT:  You're saying that I should determine that

1    this is a waivable conflict and that the waiver that was signed by

2    Officer Whitten waives that conflict?

3            MS. KENNEDY:  Yes, Your Honor.  Yes.  Yes.

4            THE COURT:  You're also arguing that the waiver wasn't

5    sufficient or least isn't sufficient right now.  What's wrong with

6    the waiver that was presented as part of the response by the

7    defense?

8            MS. KENNEDY:  I understand her ethical duty to notify

9    Officer Whitten that things may change.  What concerned me was the

10   silence on the New Mexico Tort Claims Act and the silence in the

11   waiver on the issue that counsel has raised here today, which is

12   we are not going to argue that he was acting outside the scope of

13   his employment.  That language is not in the waiver, so it needed

14   to be on the record, and it is now on the record.

15       Additionally, and this goes to -- the two exhibits we

16   provided to counsel is not only the written policy on domestic

17   disturbance, but also this Officer Whitten's use of force form,

18   which his chain of command had to review.  And in that, he is

19   dishonest and he does not tell the truth about the number of times

20   he cycled the taser.  So his chain of command failed to look at

21   the video, failed to look at the taser report and see that this

22   officer had lied.  So he is covering up his constitutional

23   violation.  This is an officer we will argue lied about whether

24   there was probable cause, lied about his motivations, lied on the

25   use of force, and was not caught, was not disciplined.  And that

```
1   is evidence that corroborates that this is a department that fails
2   to supervise, fails to train and ratifies unconstitutional uses of
3   force.
4        Now, that's going to be a great piece on cross-examination.
5   We don't know if it will come in as an exhibit, but we had to let
6   counsel know about it because they continue to maintain, who knew
7   that this officer was violating the Constitution?  So that's just
8   an example of anticipated evidence at trial and the reason that we
9   raised the Dunton conflict in the context of punitive damages, the
10  Monell claim, and the tort claims.
11            THE COURT:  All right.
12            MS. KENNEDY:  Thank you, Your Honor.
13            MS. RAHN:  Your Honor, I have no additional argument.  I
14  recognize I'm done with my chances.  But can I put a stipulation
15  on the record about the argument regarding punitive damages?
16            THE COURT:  You may.
17            MS. RAHN:  I just wanted to note that in the briefing
18  counsel noted that, at this time, because the Tenth Circuit appeal
19  is pending and has not been certified as frivolous, it is the
20  Defendant Officer Whitten's position that the Court does not have
21  jurisdiction over the Fourth Amendment claims.  We had discussed
22  at our last hearing that we would not be waiving that argument by
23  presenting that here today, and I just wanted to confirm that for
24  the record for this hearing, Your Honor.
25            THE COURT:  That was my understanding as well.  Thank
```

1  you.

2          MS. RAHN:  Thank you.

3          THE COURT:  All right.  With regard to the punitive

4  damages instruction, the Court will make that determination at

5  trial after hearing some of the evidence, which is ordinarily what

6  the Court does with regard to a request for a jury instruction on

7  punitive damages.  I understand the Plaintiff's arguments

8  concerning -- or the things that they point out that's been --

9  that have been maybe part of depositions and other things, but we

10  really need to see how that evidence comes in, what's admitted,

11  what's not, how it plays out for the jury before I make that

12  determination.

13      With regard to the conflict, I'm going to take that issue

14  under advisement.  I will determine whether or not this is a

15  waivable conflict, whether the waiver that's been presented by the

16  defense is sufficient, and I should do that relatively soon.  So

17  we'll get that out of the way as well.

18          THE COURT:  All right.  Let's move on to the next, sort

19  of, other motion outside the motions in limine, and this is

20  Document 161, Plaintiff's motion to strike and exclude wrongfully

21  withheld materials from the jury trial.

22          MS. KENNEDY:  Your Honor, just briefly, my co-counsel

23  asked me to ask you:  When do you think we will know about whether

24  the conflict is waivable?  Because if the judge does find it is

25  not waivable, we may need conflict counsel.

1              THE COURT:  It's hard to say.  I mean, I hope to get to

2    that before -- and I'll just let the parties know, the Court's

3    going to be out for a good chunk of December given some judicial

4    training out in D.C.  So I'm going to try to get this done

5    probably before I head out, which will be the end of this week,

6    but I can't make any guarantees.  We'll do the best that we can,

7    especially with regard to this issue, knowing that if there is a

8    conflict, then we're going to have to get conflict counsel here.

9    I understand that whole situation.  But I expect that we'll

10   probably have it by the end of the week.

11             MS. KENNEDY:  Thank you, Your Honor.

12             THE COURT:  I just put a lot of pressure on some of the

13   people who work with me, so we'll see how that plays out.  But we

14   will try to get that out.

15             MS. McGRAW:  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MS. McGRAW:  If I may.  Document 151, which you just

18   said we would be arguing next, if I may suggest that that follow

19   after Document 123, which is Plaintiff's motion in limine to

20   exclude any reference to the use of marijuana.

21        The reason I make that suggestion is Doc 151 is a motion to

22   strike a medical record and a related application that Defendants

23   attached as an exhibit in their response to that motion in limine.

24   We can deal with it now, but it kind of makes more --

25             THE COURT:  Well, I've read both, so I know the issue.

1  We can go either way.  If you think it makes more sense to

2  argue --

3          MS. MCGRAW:  I'd be happy to argue it.

4          THE COURT:  Well, if it makes sense to argue 123 first,

5  which is the motion in limine to exclude any reference to the use

6  of marijuana, that's fine with me if you want to do it that way.

7  I'll leave it to you.

8          MS. MCGRAW:  Sure.  Would you like me to pick up 123 or

9  do 151?

10          THE COURT:  I'm leaving it entirely up to you.

11          MS. MCGRAW:  I'll start with 123, and stop me if I bleed

12  too far into 151.

13          THE COURT:  All right.

14          MS. MCGRAW:  Okay.  Plaintiffs filed this motion in

15  limine as a result of Defendants' responsive pleadings during the

16  summary judgment phase, in that there was a strong implication

17  made by Defendants that Mark Price was under the influence of

18  marijuana at the time of the incident.  Defendants in their

19  response clarify that they are in no way making that assertion.

20  There is no evidence to support that.

21      Plaintiff moves to strike any reference to marijuana use by

22  Mark Price at any time under Rule 403, because it is substantially

23  unfairly prejudicial to the Plaintiff more than any probative

24  value.  It will confuse and mislead the jury.

25      Defendant claims in response to Plaintiff's argument that

marijuana use is relevant to Defendants' claim that Plaintiff did

not suffer emotional and mental distress as a result of his

encounter with Officer Whitten in July of 2020.  And they want to

then argue that, well, marijuana use is relevant -- and this kind

of goes into doc pleading 151, Your Honor.  However, Plaintiffs

maintain that reference to marijuana use will confuse and mislead

the jury because there is no evidence -- there's no indication

that he was under the influence at the time of the incident.  Any

other marijuana use of any other time is not relevant.

Now, in the body worn camera footage from Officer Whitten,

his body worn camera footage, after the tasing, after Mark Price

is placed in the vehicle, after Sergeant Allen tells Officer

Whitten, He's not calming down, take him to jail, they have a

discussion towards the end of the video with Lorenza Ledezma, who

was the subject of the welfare check.  During that discussion,

Lorenza is frequently interrupted by the officers, but she's

trying to explain that Mark Price has a medical marijuana card and

that, in her belief, it may make him more suspicious of others.

That -- we would move to redact that testimony from the body worn

camera footage as unfairly prejudicial, and if the Court is not

inclined to do that, we'd ask for a limiting instruction as to

what the relevancy of marijuana is, so that the jury is not

confused or misled thinking that Mark Price was under the

influence of marijuana at any time relevant to the facts at issue

here.

1          THE COURT:  All right.

2          MS. MCGRAW:  Would you like me to argue 151 or --

3          THE COURT:  Let me hear first -- I do want to hear from

4  the defense on the relevancy here.

5          MS. RAHN:  Your Honor, as Ms. McGraw stated, the

6  Defendants do not intend to argue to the jury that Mr. Price was

7  under the influence of marijuana at the time of the incident.  We

8  are happy to agree to a limiting instruction or stipulation to the

9  jury that there is no evidence that Mr. Price was under the

10  influence of marijuana.

11      What's very important, Your Honor, is that during his

12  deposition, Mr. Price stated that he suffers from anxiety now

13  after -- extreme anxiety now after the incident that did not exist

14  prior to the incident with Officer Whitten.  However, he had a

15  medical marijuana card before the incident, and he also testified

16  that he self-medicates with alcohol and marijuana.  So for the

17  record, Your Honor, although Ms. Ledezma offered that information

18  at the scene, Mr. Price himself actually testified about his

19  marijuana use in relation to this incident.  In order to put on

20  our case against damages, the City Defendants are entitled to

21  argue that Mr. Price was using marijuana prior to the incident,

22  and so the idea of self-medicating with marijuana --

23          THE COURT:  How do you make the connection between

24  the -- I think you just stated that there's -- you believe there's

25  evidence that he had a medical marijuana card before the incident.

1  How does that tie into anxiety?

2          MS. RAHN:  Well, Your Honor, I'd like to explore why he

3  had a medical marijuana card prior to the incident, because he's

4  saying now after the incident --

5          THE COURT:  Why wasn't that explored during discovery

6  and during the deposition?  And the reason I ask this is because

7  it sounds now like if we're exploring this issue in front of the

8  jury, we may be getting into -- they're going to hear about the

9  marijuana card and obviously knows that he uses marijuana for

10  medicinal purposes, and why wouldn't that be prejudicial -- overly

11  prejudicial given the minimal relevancy of what you're exploring

12  at trial?

13          MS. RAHN:  Your Honor, again, I think --

14          THE COURT:  I know you didn't write the brief, so let me

15  just say that.

16          MS. RAHN:  Sure.

17          THE COURT:  And I also noticed other things in the

18  brief, an argument under 404(b), that this is evidence of other

19  bad acts.  I don't see it as being evidence of other bad acts.

20          MS. RAHN:  As the Court probably noticed, I didn't

21  advance that argument.

22          THE COURT:  Right.  So when I read this particular

23  motion in limine, I found Plaintiff's argument to be pretty strong

24  with regard to the relevancy.  I understand the argument that

25  defense is trying to make with regard to how it might be relevant

1  to damages, but at this point, I just don't see that there's a

2  connection.

3        MS. RAHN:  Well, Your Honor, I would just ask that if

4  Mr. Price testifies as he did at his deposition, that as a part of

5  his damages from anxiety from this incident, he now has to

6  self-medicate with marijuana, they will open the door to discuss

7  the fact that he used marijuana for some type of medical condition

8  prior to this incident.  So, again, that was testimony that he

9  offered during his deposition.  I'm not representing to the Court

10 exactly how that came to play.  I'm not sure if he just

11 volunteered that.  But he did state that he suffers from extreme

12 anxiety now.  And to the extent that he mentions at trial that he

13 intends to -- that he self-medicates, then I think we should be

14 able to rebut that idea that it was caused by this particular

15 incident.

16       THE COURT:  All right.  I agree.  I think what we'll do

17 is I'll grant the motion in limine to exclude the reference to the

18 use of prior marijuana use by Mark Price, I guess also current use

19 because there is no evidence that he was using it at the time.  So

20 I'll grant the motion to exclude.  However, if there's testimony

21 at trial that opens the door, you can bring that up at trial again

22 and I will reconsider that depending on what's said at the trial.

23       MS. RAHN:  Yes, Your Honor.  Okay.

24       MS. MCGRAW:  Your Honor, thank you for that ruling.

25       COURT REPORTER:  Can you adjust your microphone?

1    MS. MCGRAW:  Yes, ma'am.  I apologize.  In every other
2    room, my voice really carries.

3        Your Honor, may we redact the body worn camera footage at
4    that section where she is discussing her belief that marijuana may
5    make him more suspicious?

6        THE COURT:  Was that part of your motion, to redact the
7    camera footage?

8        MS. KENNEDY:  No, it was not, but it would moot my
9    motion if not.  So I would ask that we do redact that.  And I can
10    give page and -- I can't right now, but I can shortly give page
11    and line as to specifically the statements made and what we would
12    seek to redact.

13        THE COURT:  Ms. Rahn, what's your position on that?

14        MS. RAHN:  It would appear to be within the scope of the
15    Court's ruling excluding the evidence regarding marijuana use, so
16    I don't have an objection based upon the Court's ruling.

17        THE COURT:  All right.  We'll go ahead and do that.
18    Thank you, Ms. McGraw.  The Court will order the redaction of the
19    part of the lapel video footage that mentions a witness' belief
20    regarding, I guess, behavior due to marijuana.

21        All right.  Now, I guess we can go into -- is it 153 or 151?

22        MS. MCGRAW:  151.

23        THE COURT:  Document 151.  This is Plaintiff's motion to
24    strike and to exclude wrongfully withheld materials from the jury
25    trial.

1          MS. MCGRAW:  Thank you for allowing me to reorganize
2     your list of the order of pleadings.
3          So in response to that motion in limine, for the very first
4     time on August 21st of 2023, which to bring us back, this case was
5     set for trial on September 11th.  So just a week and a half or so
6     before that trial setting, Defendants disclosed for the first time
7     Plaintiff Mark Price's medical cannabis certification form and his
8     application and an associated medical record that had never been
9     previously disclosed to Plaintiff in violation of Rule 26.  In
10    order to try to get around the violation of Rule 26, Defendants
11    argued in their response to Plaintiff's motion to strike that this
12    evidence is intended for impeachment only.  However, that doesn't
13    hold water when you actually look at their argument.
14         What they said is, well, we're going to use this to impeach
15    Mark Price because of this argument of whether he had anxiety
16    before or after.  However, there's no mention of the word
17    "anxiety" in any of these documents they failed to disclose.  The
18    reference is to PTSD.  There's no medical expert who can testify
19    that PTSD subsumes or includes anxiety.  Who says that Mark Price
20    knew that PTSD -- I believe it's an apples and oranges type of
21    argument that should not go before the jury without sufficient
22    testimony under 702.  We don't have that.  There's no witness or
23    expert to come in to testify to these documents.  Furthermore --
24         THE COURT:  What about the defense's argument that this
25    is just -- they basically presented it or listed it as possible

1   impeachment material, not knowing what evidence is going to be

2   presented at trial or what's going to be said at trial?

3           MS. MCGRAW:  Well, then, under that logic, frankly, we

4   could have a mountain of potential exhibits hidden away and just

5   wait to see what testimony comes out.  It's not impeachment

6   because Mark Price has never been dishonest about having a medical

7   marijuana card and having anxiety.

8           THE COURT:  Well, given what you're telling me that the

9   testimony has been so far, I can't imagine how that would become

10  impeachment, but you never know what's going to happen at trial.

11  That's why I'm saying why would I need a pretrial ruling now

12  excluding that material or saying that it can't be used for

13  impeachment when I just don't know what the testimony's going to

14  be or whether there is going to be a possible impeachment

15  opportunity for the defense.

16          MS. MCGRAW:  Fair enough.  I understand trial is a

17  living, moving, breathing entity in its own.  However,

18  Defendants -- we can look to Defendants' argument, and what they

19  are clearly using this for is to challenge damages and to say you

20  really weren't damaged because you already had -- it's what we've

21  already heard today.  You were already receiving marijuana.

22  You're not damaged.  You had already received a diagnosis for

23  PTSD.  So, one, it's not for impeachment.  That's an excuse, a run

24  around Rule 26 to avoid the implications of Rule 37.  Furthermore,

25  it's never been marked as an exhibit, and it wasn't disclosed to

1  Plaintiffs even though it's his own medical record.

2      I appreciate what Your Honor is saying about impeachment and

3  what may come at trial, but there's no evidence at this time to

4  support it as evidence for impeachment.  I would ask that the

5  Court grant our motion and that Defendants, if they believe

6  somehow it has become relevant for impeachment purposes, that they

7  then ask to approach and ask the Court to review its ruling, which

8  puts us in a quasi motion in limine land.  But what we have before

9  us right now, I don't believe it's frankly fair to look into the

10  future and say, well, it could be impeachment evidence.  There's

11  no evidence it's impeachment evidence.  They didn't withhold it

12  for that reason.  They withheld it because they withheld it.  It's

13  just -- it's not impeachment.  What this says, Mark Price has

14  never contradicted.

15      THE COURT:  Well, wait a minute.  You keep saying they

16  withheld it.  Where did that information come from?  It sounds to

17  me like it's part of his medical records.  So where did it come

18  from, the information about the -- I'm not even sure what you're

19  pointing to, but the --

20      MS. MCGRAW:  I'm sorry, it's this Exhibit C to the

21  Defendants' response to Plaintiff's motion in limine to exclude

22  reference to medical marijuana.  If you'd like, I could approach

23  and provide it to your staff member to look at.

24      THE COURT:  For some reason, I just don't have it in my

25  notebook here.  Could you do that, pass it up through Ms. Hofstra?

1              MS. McGRAW:  I'll show opposing counsel first.

2              THE COURT:  All right.

3              MS. McGRAW:  Plaintiffs -- it is my practice in my firm,

4    when a HIPAA release is provided to any entity on behalf of an

5    individual I represent, that HIPAA release requires production of

6    any records obtained in response to that HIPAA release within

7    seven days.  That's just a requirement I do to protect my clients.

8    I didn't receive anything within seven days.  I don't know how

9    they obtained that record, whether through a public records

10   request or through the use of a HIPAA release.  I, frankly, don't

11   know.  What I do know, it was never disclosed to Plaintiff and

12   Defendants do not dispute that.  They say, yes, we never disclosed

13   it but we were withholding it for impeachment.

14        However, what impeachment?  Because Mr. Price has never

15   been -- he's never denied having a medical marijuana card or being

16   diagnosed with PTSD.

17              THE COURT:  Is he going to -- for instance, I see here

18   in this documentation that it states that he presented with

19   nightmares, upsetting dreams, intrusive thoughts, sleep problems,

20   avoiding people -- this is with regard to this incident, though.

21   This isn't prior?  This says avoiding people that remind him of

22   the traumatic event.  So I guess this is going to this incident?

23              MS. McGRAW:  No, it is not.  Can you look -- now I don't

24   have the document, but I believe that record is dated 2019.  Is

25   that correct?

1           THE COURT:  That's right.

2           MS. McGRAW:  So that's before.

3           THE COURT:  All right.  So what if he testifies that he

4  hasn't -- when we're talking about damages, he testifies about

5  some things that he's suffering from.  Defense is going to

6  cross-examine him and say, You suffered from this before.  What if

7  he says no?  Wouldn't this then be impeachment evidence?

8           MS. McGRAW:  It could be, yes.

9           THE COURT:  I think that's the point.  I mean, it could

10 be impeachment evidence.  We just don't know.  And I understand

11 you're saying that you know what he's going to say and testify to.

12 But at this point, I just don't know how I can just straight out

13 exclude the material from being used at trial when I don't know.

14 I think it may be -- it could be potentially impeachment material.

15 We just don't know what the testimony's going to be.

16          MS. McGRAW:  What I would ask is that this was not

17 timely -- I would ask for a ruling from the Court that allows this

18 to be used for impeachment evidence if that situation or something

19 like it arises at trial.  However, I would ask for an order from

20 the Court that recognizes that this was not timely disclosed and

21 it has not been marked as an exhibit.  And so if -- their only way

22 they could use it then is as impeachment.  It shouldn't otherwise

23 come in.

24          THE COURT:  Yeah.  If I issue that order -- if I decide

25 that this can be used as -- potentially can be used as impeachment

1  material and I'm not going to exclude it, there's also something

2  separate and that is whether or not they're going to be able to

3  use it in an affirmative way.  I don't think that that's what

4  they're saying they're going to do.  It sounds like they're saying

5  they're going to use it only for potential impeachment.

6      So let me hear from Ms. Rahn, and then I'll make a decision

7  on that.

8              MS. McGRAW:  Yes, Your Honor.

9              MS. RAHN:  Your Honor, Plaintiff is correct.  We didn't

10  list this as an affirmative exhibit on our trial exhibit list.  It

11  was not our intention to have this be a standalone exhibit.  And

12  for the reasons that the Court explicitly articulated, the exact

13  symptoms that Mr. Price attributes to this incident and actually

14  testified at his deposition -- that he did not suffer before this

15  incident the nightmares, being easily agitated -- he actually

16  testified in his deposition that that did not happen before this

17  incident.  So it is impeachment material to address that statement

18  that he never suffered from those symptoms prior to this incident.

19      In line with the Court's ruling regarding medical marijuana,

20  we can redact the medical marijuana references simply to the fact

21  that it is a medical record that Mr. Price, that is attributable

22  to Mr. Price that states he had those symptoms before the date of

23  this incident.  He can testify however he wants at trial.  Then we

24  will have to address it.  We don't intend to address --

25              THE COURT:  Are you saying that to the extent that just

1    the issue of marijuana use might be prejudicial in some way, the

2    defense is willing to redact where this information came from, so

3    long as it's clear that this is a medical record where it is

4    documented that he suffered from those particular issues?

5         MS. RAHN:  Yes, Your Honor.  I mean, the Court already

6    made a ruling that Plaintiff has to open the door to medical

7    marijuana.  But I'm indicating that that's not the prerequisite

8    for this being used as impeachment evidence.  We agree it's not an

9    affirmative exhibit.  We didn't submit it as an affirmative

10   exhibit.  As the Court noted, this is Plaintiff's medical record.

11   I apologize, Your Honor.  I never was aware of a subpoena that was

12   submitted to the Department of Health in the case file that I was

13   provided, so it does appear that it was some type of IPRA request

14   because it is redacted.  But I don't know, Your Honor, where it

15   came from.

16       I do want to note for the Court that, to the extent that the

17   Court is swayed by the arguments that it was not timely disclosed

18   in regards to Rule 26, I want to note that Plaintiff just now,

19   after our third trial setting, disclosed additional exhibits as

20   trial exhibits, and we'll get to those objections later, and their

21   argument said basically there was no harm because they're

22   Defendants' documents.  And so if that's the argument that works

23   in terms of Defendants' documents, that any document that the

24   Defendant, the City, produces or is aware of can be used at any

25   time as an exhibit, whether or not it was disclosed in Rule 26 or

1  in discovery, then that same argument would apply to Plaintiff's
2  argument that they're prejudiced by his own medical as a surprise.
3  And, quite frankly, at this point, Your Honor, Plaintiff's been
4  aware of it for three months and will have been aware of this
5  potential exhibit and its use by the time we go to trial for four
6  or five months, which again just aligns with their arguments on
7  some of the exhibits that were disclosed by them.  So I just want
8  to note that for the record, Your Honor.

9              THE COURT:  Thank you, Ms. Rahn.

10             MS. MCGRAW:  If I may briefly respond?

11             THE COURT:  You may.

12             MS. MCGRAW:  Thank you.

13      First, there's quite a difference between a private medical
14  record and a public record maintained by the City of Las Cruces.
15  So the comparison is very different.  Furthermore, the argument
16  just raised -- and furthermore actually --

17             THE COURT:  What is the difference in terms of
18  disclosure, though?  What do you mean by there's a difference
19  between private and public records?

20             MS. MCGRAW:  Well, because the City of Las Cruces having
21  public records that are available for disclosure to the public is
22  different than how Defendant somehow obtained Plaintiff's private
23  medical records.  Furthermore --

24             THE COURT:  Is this a private medical record or is this
25  a --

1          MS. McGRAW:  I would think so.

2          THE COURT:  It's from the New Mexico Department of

3   Health.  I guess it is patient information and you would imagine

4   that it's -- it should be protected.  But, again, Ms. Rahn

5   obviously has stated that she doesn't know exactly how this was

6   obtained.  She wasn't counsel then, so I take her for her word on

7   that.

8          MS. McGRAW:  And I don't have any qualms with what she's

9   saying.  I don't dispute that.  And that -- these questions you're

10  asking me go to foundation, also, and to the admissibility of this

11  document.  Where did it come from?  Who created it?  But in

12  addition, there's quite a misnomer, and I see it in multiple

13  cases, which is that an individual patient actually knows what is

14  contained in their medical record.  I don't get to review my

15  medical record and vet it with my doctor to make sure it's

16  accurate, nor did Mr. Price.  We never saw this record until it

17  was produced by Defendants.  I do not know how they obtained it.

18  I do not agree that they withheld it because of impeachment

19  because that argument doesn't hold water based on what we know

20  now, though I appreciate and I'm not trying to reargue or open up

21  what you've already said.

22      But I just want to raise the point that we still have the

23  foundational issue on this record and where it came from and all

24  these questions.  And the fact that we don't know, I think, would

25  go to its inadmissibility even for impeachment.  That's all.

1          THE COURT:  Thank you.

2          MS. MCGRAW:  Thank you.

3          THE COURT:  I guess with regard to Document 151, the

4   Court will deny in part and grant in part the motion.  The ruling

5   will be that given the defense's position or clarification to the

6   Court that it's not being used as an affirmative exhibit but

7   rather potentially impeachment material, I'm not going to

8   altogether strike and exclude that material from the jury trial.

9   However, I will exclude it as an exhibit to be presented to the

10  jury or to be admitted into evidence.  But at this time, I do see

11  that that material could potentially be impeachment material, so

12  the Court is not going to altogether exclude it.

13         I hope that makes sense.  I'll try to get something out

14  that's a little clearer, at least in the text-only order.  But if

15  anyone has any questions about that?

16         MS. RAHN:  No, Your Honor.

17         MS. MCGRAW:  No, Your Honor.  May I have the exhibit

18  back, unless you need it?

19         THE COURT:  I'll just double-check.  For some reason, I

20  didn't have it in my materials, but it might have been because it

21  came later after we put it together.  But I will -- Ms. Hofstra?

22         MS. MCGRAW:  If Your Honor would like --

23         THE COURT:  Do we have that?

24         Thank you, Ms. McGraw.

25  (Court confers with law clerk.)

1          MS. McGRAW:  Thank you, Your Honor.

2          THE COURT:  All right.  Having gone through the other

3    motions and at least one of the motions in limine, let me see

4    where we're at here.  I guess I'm just going to go in order of how

5    they were filed.  This is Document 120.  This is the Plaintiff's

6    motion in limine to exclude any reference to Plaintiff's history

7    with NMSU and NMSU Police Department.

8          MS. McGRAW:  Your Honor, the encounter between Mark

9    Price and Officer Whitten occurred at Mark Price's home.  There's

10   no -- on his property, at his home.  Nothing regarding the facts

11   at issue in this case involve NMSU or have any relevance to New

12   Mexico State University.

13       Defendants -- the information Defendants seek to place in

14   front of the jury derive from a time period over 15 years ago,

15   from 2008 -- 2007 to 2008, and it includes arrests and Mr. Price

16   being a suspect in uncharged criminal conduct.  This is not

17   relevant, not probative, and substantially prejudicial to the

18   Plaintiff in this case and it should not be admitted.

19       Importantly, when Officer Whitten arrived at Mark Price's

20   home on July 27th of 2020, he had never encountered him.  He knew

21   nothing about him.  He didn't know about Mark Price's interactions

22   and involvement with officers 15 years prior at NMSU.  There is no

23   relevance.  It's not probative.  Furthermore, under Rule 609,

24   subpart B, Defendants have not provided any reasonable notice in

25   writing of their intent to use the -- this smattering of events

1    and it's improper evidence under 404(b)(2).

2        So for those reasons, Plaintiff moves to strike any reference

3    or testimony regarding Plaintiff Mark Price and his activities at

4    NMSU in that 2007-2008 time frame when he was just 18, 19 and 20

5    years old.

6            THE COURT:  Thank you, Ms. McGraw.

7            MS. MCGRAW:  This motion in limine ties very closely

8    into the other motion in limine, which is interactions with the

9    criminal justice system.

10           THE COURT:  Do you want to go ahead and make argument

11   with that as well?

12           MS. MCGRAW:  If you don't mind.  I separated them

13   pursuant to your pretrial order where you wanted distinct subjects

14   separated, so I wanted to be careful there.

15       Plaintiff turned 18 years old in 2006.  Yet, under -- in his

16   deposition, prior defense counsel asked him about charges and

17   allegations made against him when he was a juvenile, in 2006 and

18   in 2005.  They want to bring in evidence that at the age of 17,

19   Mark Price called an officer a pig.  17 years old.  He was a

20   juvenile.  How is what happened more than almost -- I can't even

21   do the math -- 18 years prior -- or 16 years prior to the incident

22   in question have any relevance or probative value except to

23   prejudice the Plaintiff in the eyes of the jury, which is what it

24   will surely do.

25       Mark Price did not speak in a disrespectful manner at any

1   time to Officer Whitten.  He called him sir.  He was asking

2   questions.  He did not use derogatory terms like pig or anything

3   like that.  And so to bring this in from 15 or 16, 17 years prior,

4   is just substantially prejudicial to the Plaintiff.

5        Defendants, in their response to Plaintiff's motion to

6   exclude all of this uncharged conduct, arrest, and being a subject

7   in criminal investigations, Defendants claim that it's relevant to

8   prove Plaintiff knew he was not, in fact, allowed or free to leave

9   during his encounter with Officer Whitten.  Well, that assumes a

10  lot, one.  Plaintiffs do argue that Mr. Price was free to leave.

11  But that's so attenuated, to say that because of his encounters as

12  a juvenile and a young man, 18, 19 years old, that he -- that that

13  should be relevant to show what he knew or purported to know when

14  he was 32 or 33 years old in July of 2020.

15       It's so attenuated.  It's substantially prejudicial to

16  Plaintiff.  And akin with our arguments on excluding any reference

17  to incidents occurring at NMSU, we ask that the Court also grant

18  this motion and allow us to focus on the incident in question and

19  what Officer Whitten knew at that time.

20       If these -- all these various older misdemeanor crimes or

21  arrests were admitted into evidence, we would need much more than

22  a four or five day trial.  We would have lawsuits -- I mean, we

23  would have literally testimony about other incidents in front of

24  the jury.  We'd have to dispute what they're claiming because it's

25  based only on police reports.  We'd have to call those officers.

1    We would be needing a two-week or more trial.  And that goes, once

2    again, to why 403 should govern this issue.  It will confuse and

3    mislead the jury, it's a waste of time, and it's substantially

4    unfairly prejudicial to the Plaintiff.

5        I just want to look if I have anything else.  I'll wait and

6    reserve any other argument in response to arguments made by

7    Defendant.  Thank you.

8            THE COURT:  Thank you, Ms. McGraw.

9            MS. RAHN:  Plaintiff --

10           THE COURT:  We're dealing with both 120 and 121,

11   Ms. Rahn.

12           MS. RAHN:  Yes, Your Honor, and I do believe that they

13   are connected, so I'll just address them both jointly.

14       So in both the specific incidents with NMSU, as well as the

15   general interactions with criminal justice, Plaintiff's counsel

16   represented that these incidents occurred 15 years before our

17   incident in this case, which occurred in July of 2020.  The most

18   recent incident with law enforcement generally is actually June of

19   2020, which is one month before our incident here.  So the idea

20   that there was such a significant time frame that has nothing to

21   do with Plaintiff's current behavior or attitudes is belied by the

22   evidence that we presented here listing out the time line, which

23   notes the most recent incident with LCPD was in June of 2020 and

24   the most recent incident with NMSU PD was actually in 2013.  So

25   they were not 15 years ago.  There were some that were actually

1  only 13 years prior to this incident.  However, there are more
2  recent incidents.

3      Additionally, Plaintiffs argue that we had to give specific
4  notice under Rule 609 of the Federal Rules of Evidence.  That
5  actually only applies to evidence of convictions, so that does not
6  apply in this case.

7      Defendants offer three reasons why this evidence is relevant.
8  First, Mr. Price stated that he believed he did not need to follow
9  officer's commands and that he would follow officers the way he
10  would do with any individual, any ordinary person.  However, his
11  repeated interactions with law enforcement and his repeated
12  arrests for failure to comply with officer commands is relevant to
13  show that he did know that he was not free to leave, and Officer
14  Whitten actually told him he was there to conduct an investigation
15  because of a call that he had received.  So the idea that
16  Mr. Price was unaware that he was not free to leave is something
17  that we can explore in regards to Plaintiff's previous involvement
18  with law enforcement.

19      I also want to address this idea.  This would be used for
20  impeachment.  Under rule -- under the Rules of Evidence, the
21  Court -- we only have to have a preponderance belief that these
22  facts occurred in order to introduce them.  Mr. Price is welcome
23  to say, I didn't say that.  The police report is wrong.  These are
24  statements by a party opponent, and they are reasonably attributed
25  to him, and we are entitled to cross-examine him about prior

1    statements.  Again, the Court -- the jury would be free to either

2    accept or reject Mr. Price's testimony that the police report is

3    accurate and he did not make those statements.

4         Additionally, we cited in our briefing, Your Honor, that at

5    least one district court in this district has found that this type

6    of evidence is relevant to show that the Plaintiff had knowledge

7    he could not lawfully resist arrest and to probe credibility of

8    testimony in that regard.  Additionally, Mr. Price has overtly

9    stated multiple --

10             THE COURT:  Who was that?  Which district judge was

11   that?  Do you have a case?

12             MS. RAHN:  It is Judge Browning.  I do have the case

13   number.  It's on page 7 of Docket No. 140.  It's <u>Maples v. Vulmer</u>

14   and I'll provide the case number, which is CV-2012-0294.  Do you

15   want the WestLaw citation, Your Honor?

16             THE COURT:  Yes, please, if you have it.

17             MS. RAHN:  Yes, sir.  So it's 2013 WL 1677104.

18        So at least one district court has found this type of

19   evidence is relevant in that regard.

20        Additionally, Mr. Price testified repeatedly that he does not

21   like police officers.  He's testified that he's afraid of them,

22   and that he does not -- and that he's actually made statements to

23   them, not 17 years ago but recently, to say, You're dismissed,

24   servant, and other statements like that.  That goes to the

25   argument that Mr. Price did not follow Officer Whitten's commands,

1  not because he didn't believe he had to, but because he doesn't

2  like the police.  And it also allows the Defendants to argue that

3  Mr. Price's testimony in this case is motivated by his dislike of

4  the police, which is a proper subject of testimony.  Your Honor,

5  Plaintiffs in this case --

6       THE COURT:  How do we get to that?  How do these prior

7  incidents that occurred -- mostly which occurred ten years ago or

8  more, I know you have one that occurred in 2020 -- how do we then

9  say -- I don't understand how you're getting to the point that he

10  doesn't like the police based on these incidents.

11       MS. RAHN:  Well, he's actually stated he doesn't like

12  the police, and we want to argue that his negative encounters with

13  the police previously informed his actions in this case and

14  informs his damages.  He indicates he's especially terrified by

15  what Officer Whitten did, when he's also been involved in other

16  uses of force with other officers.  And so we intend to --

17       THE COURT:  I don't see the connection there.  Just

18  because he had other incidents with other officers, how does that

19  negate his testimony now regarding how he felt with Officer

20  Whitten?

21       MS. RAHN:  It doesn't negate it, Your Honor, but it goes

22  to whether or not there are other factors for his extreme anxiety,

23  as well as he testified that he suffers from PTSD -- he actually

24  testified to that in this case -- and the fact that he gets

25  nervous around law enforcement.  Again, Your Honor, it doesn't

1    negate it.  He's still welcome to testify about what he felt about

2    what Officer Whitten did, but it would be an incomplete picture

3    for the jury to suggest this is the only negative encounter that

4    he's had with law enforcement and that all of his negative

5    feelings and all of his anxiety and PTSD are attributable to this

6    single negative encounter with law enforcement when he's had

7    multiple others.

8         In regards to the Court's concerns about attenuation, we

9    recognize we've presented all of the events.  However, we would be

10   willing to limit testimony to things that happened more recently.

11   I just did want to note, Your Honor, I did mention one incident

12   that occurred in 2020.  There was also one that occurred in 2019.

13   So I wanted to be clear that not all of them are from earlier.

14   But the Court has the timeline in front of it.

15        So, again, Your Honor, it's relevant to the fact that

16   Mr. Price is going to tell the jury that he didn't think he had to

17   follow officer's commands, and that's undermined by the previous

18   other involvement he had with law enforcement where he was given

19   commands and he was arrested for not complying with those commands

20   and, additionally, his bias towards police and his motivation for

21   bringing this particular lawsuit, as well as to the cause of his

22   damages in this case.

23             THE COURT:  Was he convicted of not following police --

24   are there any convictions that go to whether or not he actually

25   complied with officers, or are those just allegations in police

1  reports?

2          MS. RAHN:  Your Honor, I don't believe we submitted any

3  convictions that were of a -- that were governed by 609.  That

4  does require either a crime of dishonesty or a felony conviction

5  and none of them fell under 609.  So I don't believe we were

6  intending to introduce evidence of the conviction itself but

7  rather the nature of the interaction with law enforcement.

8          THE COURT:  Thank you, Ms. Rahn.

9      Ms. McGraw?

10          MS. MCGRAW:  I need to challenge what is currently in

11  the record, which is that Mark Price fights all police officers.

12  That directly refutes his deposition testimony.

13      Question, and this is at 102, starting at line 16 of Mark

14  Price's deposition.

15          Question by former defense counsel Cody Rogers:  "You've

16      had that attitude that you dislike police officers and law

17      enforcement since you were a child?"  This goes to my point

18      about the attenuation.

19          Answer:  "Yeah.  I've disliked officers for awhile, a

20      lot of them.  There's like -- but I've met some cool ones,

21      too.  There's some that play basketball with me and stuff

22      like that.  And there's some that, like, sat down and talked

23      with me.  And then there's some that did what Officer Whitten

24      did to me."

25      And he goes on and talks about that.  But for them to say

1    that this is just -- it's a broad brush for them to say he

2    dislikes police officers.  We need to establish that, and that's

3    why this encounter unfolded the way it did, is incorrect and a

4    misstatement on the record.

5        Furthermore, I am perplexed by counsel's reference to Rule

6    609 and saying, well, that only applies with convictions.  Is that

7    implying that an arrest and uncharged conduct are somehow

8    admissible?  Because they are not.  Rule 609 determines when

9    convictions can actually come into evidence.  And that should be

10   the demarcation that we are looking at.

11       In June 2020, Plaintiff had an interaction with law

12   enforcement over -- a dispute over a parenting plan on Father's

13   Day as to whether he got to see his daughter or not.  There was no

14   crime.  There was no taser.  There was no gun.  How is that

15   incident in any way relevant or probative of what occurred between

16   Officer Whitten and Mark Price in July of 2020?  It is not.  What

17   it is, is it's 404, inadmissible evidence that they want to use to

18   say because Mark Price acted this way when he was 16, 17, 19, then

19   that is why he acted this way now.  That is the purpose behind

20   404, and we ask that this evidence be excluded on that basis

21   alone.

22       Furthermore, I am very troubled by the idea that -- and what

23   I envision, if this were admitted evidence, is that defense would

24   come up when Mark Price were testifying and they would use

25   multiple reports to say, Didn't you say this?  Didn't you say

1    that?  The prejudice to Plaintiff is I, as his counsel,

2    Ms. Kennedy, have no way of refuting what is documented in the

3    police report.  That's all we would have.  It's insubstantial

4    evidence.  It's outdated.  Those officers may not even work with

5    the police department.  And that -- I mean, I think that's at the

6    heart of why this is so problematic when there's no evidence of

7    actual conviction -- those convictions being admissible under Rule

8    609.  So that, I believe, rounds out my argument unless you have

9    any other questions for me, Your Honor.

10              THE COURT:  No.  Thank you, Ms. McGraw.

11              MS. MCGRAW:  Thank you.

12              THE COURT:  All right.  I'm going to -- with regard to

13   both Document 120 and 121, I intend to rule this morning or it

14   might be this afternoon.  So let's move on to Document 120 and 121

15   after we make this next argument.

16       So the next motion in limine is Document 122, the opposed

17   motion in limine to prohibit improper statement.  Is this

18   Plaintiff's motion?  Ms. McGraw?

19              MS. MCGRAW:  It is, Your Honor.  If I may have just one

20   moment.

21              THE COURT:  You may.

22              MS. MCGRAW:  Your Honor, I do not believe that this

23   motion is actually opposed.  I can go through it, but if I may

24   just look to defense counsel and ask that.  I'm not sure where we

25   are on this.

1    MS. RAHN:  Your Honor, this motion isn't opposed.  I
2    just -- perhaps it would be useful to place on the record exactly
3    what we're agreeing is outside the scope of appropriate testimony
4    or arguments by counsel, but it's not -- the things that were
5    delineated in this motion Defendants agree will not be argued at
6    trial.
7         THE COURT:  All right.  Then I'm going to go ahead and
8    grant the motion in limine to prohibit those statements in
9    Plaintiff's pleading.
10        Is there another one also with the same -- I thought I saw a
11   similar motion in limine.  If not, then we can just move on.
12        MS. MCGRAW:  The only other one would be the -- that
13   Plaintiffs filed, Your Honor, would be to exclude references to
14   victim.  The other one you might be thinking of is to prohibit
15   distortion of jury instructions and the law, but --
16        THE COURT:  Well, let's just go one by one.  With regard
17   to Document 122, the Court will grant that motion given the
18   stipulation by the parties.
19        Now we're on Document 124, which is the motion in limine to
20   exclude any reference to any purported victims.  Is that still at
21   issue, Ms. Rahn?
22        MS. RAHN:  Yes, Your Honor.  It was opposed by
23   Defendants.
24        THE COURT:  All right.  Go ahead, Ms. McGraw.
25        MS. MCGRAW:  Your Honor, and I apologize, I do have the

1  sniffles today.

2      Plaintiff's motion in limine to exclude reference to any

3  purported victims is because Defendants revealed through their

4  briefing in response to MSJs they like to refer to Lorenza Ledezma

5  as a victim.  A victim of what, is the issue.  Calling Lorenza

6  Ledezma a victim in front of the jury insinuates that a crime was

7  committed.  There is no evidence that a crime was committed

8  against her.  And to allow Defendants to refer to her as a victim

9  is unfairly prejudicial to the Plaintiff and will mislead and

10  confuse the jury in violation --

11          THE COURT:  Is she the aunt or is she the caller?

12          MS. MCGRAW:  She's the great aunt, the subject of a

13  welfare check, which is how she should be referred to.  She should

14  be referred to as Lorenza Ledezma, Ms. Ledezma, or the subject of

15  a welfare check.  Calling her a victim, a victim of what?  And it

16  is unfairly prejudicial, and we ask that that not occur at trial

17  because we will have to unwind that in a confusing manner.  I

18  mean, it's just unnecessary and its implication, as I've said,

19  violates Rule 403.

20          THE COURT:  Thank you.

21          MS. MCGRAW:  Thank you.

22          THE COURT:  Ms. Rahn?  I guess this will be short

23  because you don't have any notes.

24          MS. RAHN:  Maybe I just have a lot memorized, Your

25  Honor.

1    Your Honor, in this case, it is Defendants, the crux of their
2    defense, that there was a potential crime in this matter.  And so
3    the idea that insinuating there was a crime that happened is
4    something the defense cannot do in this case.  I mean, the
5    Defendants cannot put on their defense.  So we intend to argue
6    that there was a potential crime in this matter.

7        THE COURT:  Was he ever charged or convicted for
8    domestic violence?

9        MS. RAHN:  Mr. Price was not, but we do want to clarify
10   for the jury what Officer Whitten believed at the time.  We're not
11   arguing about convictions.  We're arguing about reasonable
12   suspicion to --

13       THE COURT:  Why can't that be done?  I mean, it seems
14   like he would just testify, I believed she was a victim, and that
15   should cover it.  Why refer to her as a victim?  Because I can
16   kind of see the Plaintiff's point on this one.  Referring to
17   somebody as a victim over and over in front of a jury may lead
18   them to believe -- may confuse the jury and lead them to believe
19   that actually she was a victim.  Whatever may have happened, she
20   was a victim of something.  Otherwise, they wouldn't be calling
21   her a victim at trial.  So isn't that a legitimate concern?

22       MS. RAHN:  Well, Your Honor, in the Court's suggestion
23   that Officer Whitten states, I believe she was a victim, the
24   motion in limine is very broad to say that we can never refer to
25   Ms. Ledezma as a victim.  So if Officer Whitten wants to testify

1  that in his scheme of organizing the individuals, we had the
2  calling party, Ms. Ledezma who was the potential victim, and then
3  we had Mr. Price who would have been the suspect in the
4  information that he had.  Plaintiffs are welcome to argue there's
5  no evidence to support that, but simply orienting the jury.  I
6  agree with the Court that perhaps there could be a limitation on
7  counsel standing up and stating in opening and repeatedly
8  referring to her as the victim.  I mean, I'm happy to refer to her
9  as the potential victim, just to orient the parties to what the
10 layout of the investigation was.

11      But what the Court suggested, I believe, would actually be
12 prohibited by the idea that there's no reference to Ms. Ledezma as
13 the victim.  And so if the Court can give a less broad ruling than
14 a total prohibition of saying Ms. Ledezma --

15          THE COURT:  You're basically saying that their request
16 is too broad?

17          MS. RAHN:  Yes, Your Honor.

18          THE COURT:  Let me hear from Ms. McGraw on that.  I'll
19 say, Ms. McGraw, to start off here, I assume that the argument
20 from Officer Whitten, obviously, is that he did have reasonable
21 suspicion.  He believed something had gone on.  He thought --
22 based on what I've read, he thought this might be a domestic
23 disturbance or domestic issue, so he thought that she was a
24 victim.  Why wouldn't he be able -- given what you're asking me to
25 do, it seems like it would be very broad and would even prohibit

1  him from saying that he believed she was a victim.

2          MS. MCGRAW:  Well, first, I don't believe, respectfully,

3  that Officer Whitten has ever provided any testimony to

4  substantiate what actual crime he believed had occurred.  What he

5  says is a domestic disturbance, and he clearly says a domestic

6  disturbance is not a crime.  It's a verbal argument between family

7  members, which goes to was Mark Price not a victim then, too?  At

8  what point do we stop this argument when it's not even a crime?

9          Referring to someone as a potential victim is not as

10  prejudicial as calling them a victim.  I agree with that.  Officer

11  Whitten saying that he was investigating -- I mean, that's where I

12  come down, is he doesn't say he was investigating a crime.  So how

13  can he say she's a victim of what?  And it's what I come back to,

14  a verbal argument between family members?  Then we look at -- I

15  appreciate the line that's trying to be drawn, but it still comes

16  back to the implication it gives is that there was actually a

17  crime being investigated, and Officer Whitten has given no

18  evidence to this date of a crime he was investigating.

19          He says clearly in his testimony -- and Ms. Kennedy read it

20  to you earlier -- that he had no evidence of a crime up to the

21  point he arrives at the house.  And that what he did believe

22  wasn't wrongdoing but a domestic disturbance.  So how can you have

23  a victim when there was no wrongdoing and there's no crime?  That

24  is why I'm saying it's too prejudicial.

25          I appreciate where Your Honor's going and I don't -- I will

 1  not challenge, obviously, you saying that for the limited purpose

 2  Officer Whitten can say he was evaluating whether Ms. Ledezma was

 3  a potential victim.  That's a different presentation to the jury

 4  than referring to her as victim or the victim.  I believe that

 5  distinction is clear, but...

 6            THE COURT:  Thank you, Ms. McGraw.

 7        And I do -- just to say, I now recall some of the testimony

 8  that was presented in the briefing with regard to what Officer

 9  Whitten said he was doing at the time, and I have to agree with

10  them that he never says that a crime had been committed with

11  regard to the domestic call.  But I am concerned about the breadth

12  of the ruling.

13        For now what I'll say is I'll grant in part the motion in

14  limine to exclude the reference to purported victims, but I will

15  allow -- for instance, I guess the one limitation would be, I

16  imagine Officer Whitten will say he was evaluating whether or not

17  there was a potential victim or something to that effect.  I think

18  I will allow that.  But any reference to victims or the victim in

19  the case, I am going to exclude that.  I just think, to the extent

20  that it's relevant, it is unduly prejudicial.  It certainly

21  outweighs the relevancy here.  I don't see the need to refer to a

22  victim when there was no charge, no conviction.  I just don't see

23  that that would be something that the jury needs to hear.  I think

24  it would confuse them as well.

25        So I'm going to go ahead and grant that motion in limine,

1    maybe not as broad as requested, but I am going to grant it to

2    some extent.  I'll try to make it a little clearer with regard to

3    the limitation in whatever order we issue, whether it be a

4    text-only order or an actual written order.

5             MS. MCGRAW:  Thank you, Your Honor.

6             THE COURT:  Let's move on to -- this is -- I think this

7    is a defense motion?  It's 127.  This is motion in limine to

8    exclude evidence of compliance or noncompliance with departmental

9    policies or procedures.

10        Is this your motion, Ms. Rahn?

11            MS. RAHN:  Yes, Your Honor.  So at the outset, I want to

12   be clear that the motion, this particular motion in limine, is

13   with the departmental policies and procedures specifically.  And

14   in Plaintiff's response they argue about whether or not there's

15   any expert testimony allowed in this case.  So I just want to

16   focus the Court's argument about the -- or attention to the

17   argument that's made in this case.

18        The Tenth Circuit cases, as well as the Courts out of this

19   district, make it extremely clear that evidence of violation of a

20   department SOP in regards to use of force is not admissible.  And

21   those cases are collected on Docket No. 127, page 3, Medina v.

22   Cram, excluding expert affidavit which stated that officer's use

23   of force did not conform with accepted police guidelines and

24   practices because claims based upon state law, violations of state

25   law and police procedure are not actionable under Section 1983.

1    Courts have routinely excluded an argument or evidence that
2    officers' actions did not comply with their use of force policy.
3    There is no case law that Plaintiffs presented in their response
4    as to that issue.

5        Instead, they argue that their expert can testify.  This was
6    not a motion in limine to fully exclude their expert's testimony,
7    but to prevent an argument from being made to the jury that
8    Officer Whitten's actions violated department policy because that
9    is not the standard in this case.  The standard in this case is
10   whether or not his actions are objectively reasonable and that,
11   under 403, is likely to confuse the jury in terms of the standard.
12   If Plaintiff is allowed to argue to the jury that Officer
13   Whitten's actions violated LCPD's policy, the jury is likely to
14   confuse that standard with the actual standard in this case.

15       This is exacerbated, Your Honor, by the jury instructions
16   that Plaintiffs submitted in this case, which actually ask the
17   Court to give the jury an instruction that violation of police
18   procedures demonstrates a constitutional violation.  That was
19   explored further in our objections to jury instructions.  But this
20   isn't a theoretical concern that Defendants have.  It's actually a
21   jury instruction that Plaintiff asked the Court to enter that a
22   violation of departmental SOPs is a Fourth Amendment violation.

23       Now, I recognize, Your Honor, that we have a complicating
24   factor in this case outside of the use of force context, which is
25   that Plaintiffs argue that Officer Whitten was actually following

1  the policy regarding arrests or investigations of domestic

2  disturbances.  We concede for the purposes of a _Monell_ claim that

3  that evidence would be relevant as to that specific policy.  We

4  had a different objection to that exhibit that we'll address when

5  we reach objections to exhibits, but I anticipate that Plaintiffs

6  are going to say how can we put on our _Monell_ claims if we can't

7  argue violations or conformance with police procedures.  I'm

8  talking specifically about use of force policy in this case.

9          THE COURT:  How do we parse out the two at trial?

10         MS. RAHN:  Well, they're two separate policies, Your

11 Honor.  The idea of whether or not Officer Whitten's use of a

12 taser would have been justified under LCPD's use of force policy

13 is an argument, and then there's a separate argument about whether

14 or not his detainment -- his detaining of Mr. Price complied with

15 their investigations policy regarding domestic disturbances.  So I

16 do think there's a clear line to be drawn between the two of

17 those.  Their expert should not testify --

18         THE COURT:  What you're saying is that the testimony

19 regarding whether or not he violated policy in the way that he

20 tased him, that should be excluded because Tenth Circuit law makes

21 it clear that you can't base a 1983 excessive force claim on the

22 violation of a policy?

23         MS. RAHN:  Yes, Your Honor.

24         THE COURT:  Okay.  But you're not saying, with regard to

25 their _Monell_ claim, which is based on a different policy, you're

1  not -- that, obviously, is going to come in.

2         MS. RAHN:  Yes, Your Honor.  And Plaintiff's counsel's

3  correct.  The earlier counsel did not move to bifurcate this case

4  by the timeline.

5         THE COURT:  You can just put everything on --

6         MS. RAHN:  I could, Your Honor.  I'm attempting not to.

7  I hope the Court understands that I recognize that I'm here

8  representing this client with the record before me.

9      No, Your Honor, I recognize that it is a little bit

10 complicated because it isn't a bifurcated case.  However, their

11 Monell claim depends on a separate policy.  So I'm not arguing

12 that they can't present their Monell claim.  It is specifically

13 the allegation that his conduct violated LCPD's use of force

14 policy, which is at issue with our motion, and that is separate

15 from the policy upon which they base their Monell claim.  Again, I

16 believe Tenth Circuit law, as well as the law from this district,

17 is very clear about exclusion of this under Rule 403 as unfairly

18 prejudicial, likely to confuse the jury, as well as relevance.

19 It's actually included in relevance as well in the cases that are

20 cited here in our brief.

21        THE COURT:  Thank you, Ms. Rahn.

22        MS. RAHN:  Yes, Your Honor.

23        MS. KENNEDY:  Your Honor, with all due respect to

24 present counsel, what's so confusing about Defendants' motion in

25 limine to exclude evidence of compliance or noncompliance with

1    standard departmental policies or procedures is the lack of an

2    identification of a specific policy and procedure.

3         So the problem is, is that in the pretrial order and in the

4    anticipated testimony of Scott DeFoe, is his understanding from

5    his review of the LCPD policies and procedures, is that there is a

6    Graham v. O'Connor excessive force policy and procedure and taser

7    policy and procedures that were violated by Officer Whitten in

8    this case, and that the failure to enforce the violation of these

9    procedures is a moving force behind the use of force and behind

10   the wrongful arrest and the violations of Mr. Price's rights.

11        So the area of case law that the defense depends on are those

12   use of force cases with an individual officer under Section 1983

13   where counsel tries to say you violated an SOP so you violated the

14   Constitution.  Clearly, that's an overreach and unfair and

15   confusing and prejudicial.  Plaintiffs do not anticipate our

16   expert would testify to that or that we would make that argument.

17             THE COURT:  So you're not going to be -- the Plaintiff

18   is not going to be making the argument that in the way that the

19   Plaintiff was tased was a violation of departmental policy?

20             MS. KENNEDY:  Oh, it was, but we're saying that the --

21   that a moving force behind the violation of that policy is his

22   knowledge that he can violate that policy and there is no

23   consequence.  So I don't think anyone's going to say that the

24   policy, the excessive force policy itself, is unconstitutional.

25   It's the failure of his chain of command to enforce it.  They have

1  a Graham v. O'Connor policy.  Objectively reasonable officers
2  follow Graham v. O'Connor.  We are saying he violated the Fourth
3  Amendment because he violated Graham v. O'Connor, not that he
4  violated the Fourth Amendment because he violated SOP policy.
5       THE COURT:  But isn't that going to come in though?
6       MS. KENNEDY:  It is going to come in.
7       THE COURT:  And that seems to be sort of in conflict
8  with cases like Medina v. Cram and other Tenth Circuit cases
9  because it implies to the jury -- and I can see the jury taking
10  that evidence as saying if he violated that policy regarding
11  tasing, then he's liable in some way.  And that's what I'm
12  concerned about, because those cases are pretty clear that you
13  can't have -- you can't base a 1983 excessive force claim on the
14  violation of a departmental policy.
15       MS. KENNEDY:  What's lacking from those cases is the
16  foundation that an objectively reasonable officer would follow his
17  SOP policies, because he knows that if he violates them, he will
18  be disciplined up to and including termination.  That is how the
19  policy itself comes in.  It does not come in to say, you know,
20  Jury, if he violated the SOP, he's violated the Fourth Amendment
21  under Section 1983.
22       THE COURT:  What about the jury instruction that
23  Ms. Rahn pointed to?  It seems to me -- and I haven't gone back to
24  look at it, but the defense is saying that Plaintiffs have
25  proposed a jury instruction that actually says exactly that.

1          MS. KENNEDY:  The jury instructions are based on <u>Allen</u>

2    <u>v. Muskogee</u>, <u>City of Canton v. Harris</u>.  And specifically the case

3    that really guides the Court on the proper use of SOPs is <u>Valdez</u>

4    <u>v. Motyka</u>.  It's a 2020 case.  In quotes, "A pattern of inadequate

5    investigations into excessive force may be enough to infer an

6    unwritten policy of tolerance towards officer's actions in

7    violations of written policies."  So the policies come in not

8    to --

9          THE COURT:  On the <u>Monell</u> claim?

10         MS. KENNEDY:  Absolutely, on the <u>Monell</u> part.  And

11   that's -- and our police procedures expert is an expert in <u>Monell</u>

12   policies.  He's an expert in internal affairs and why they're

13   necessary.

14         THE COURT:  That's different -- that's -- and I'm just

15   trying to parse this out; I'm not trying to be difficult.  But it

16   sounds like Ms. Rahn is saying that what she wants excluded, what

17   the defense wants excluded, is any testimony that implies or

18   expressly states or tells the jury that Officer Whitten violated

19   departmental policies in the way that he tased Plaintiff, and,

20   therefore, it was excessive force.  You're not going to do that,

21   is what you're saying?

22         MS. KENNEDY:  No.  We're going to say it's excessive

23   force because it's a violation of <u>Graham v. O'Connor</u>, Your Honor.

24         THE COURT:  Right.  But you're not going to point to the

25   violation of the SOPs or departmental policies to support that.

1          MS. KENNEDY:  Right.  What we would like to be -- that's

2   true, but what we would like to be able to establish as a

3   foundation is that objectively reasonable officers follow their

4   SOPs.

5          THE COURT:  Well, I think that kind of loops back around

6   to the problem.  I think that goes back to the Tenth Circuit cases

7   that are concerned with exactly that.

8       The issue is whether or not the officer was objectively

9   reasonable in the way that he acted.  And the Tenth Circuit has

10  determined one way you can't show that is to say that he violated

11  departmental policies because -- in other words, I think the Tenth

12  Circuit is concerned that that's just too simple of a way to get

13  to an excessive force claim when there's the totality of the

14  circumstances to be applied.

15      So I understand what you're saying and I agree with you that

16  with regard to the Monell claim, that's entirely different if your

17  expert is going to talk about those policies.  But with regard to

18  whether or not Officer Whitten violated the Plaintiff's Fourth

19  Amendment rights, I'm not sure that evidence of -- I'm not sure

20  that that can be supported by evidence that he violated

21  departmental policies with regard to the tasing.  That's my only

22  issue.

23         MS. KENNEDY:  I understand, Your Honor.  And that is why

24  we have argued that that is a question of law and not a question

25  of fact.  Because the reality is it's a question of law as to

1  whether Officer Whitten violated clearly established law in <u>Graham</u>
2  <u>v. O'Connor</u> and we will argue that he did and that he violated the
3  law.  And so whether he violated the SOPs on the question of the
4  Fourth Amendment is irrelevant largely.

5              THE COURT:  Okay.

6              MS. KENNEDY:  But the other issue that has come up that
7  is not addressed in this motion in limine and is why this motion
8  in limine is so overbroad and confusing is the SOP in related to
9  Officer Whitten's unconstitutional initial detention.  I mean, his
10 defense is the reason I could continue to detain him is because,
11 pursuant to policy, I had to confirm his identification because
12 they make me write a police report if there's a domestic
13 disturbance, regardless of whether there's a crime, and I did that
14 pursuant to policy.  And we believe that policy is admissible.

15             THE COURT:  Yeah.  And I don't -- the way that you've
16 just stated that, that's not part of the excessive force claim.
17 That's part of the reasonable suspicion, detention.  So I'll ask
18 Ms. Rahn about that.  But I tend to agree with at least what
19 you're saying right now.  That situation and the evidence
20 concerning the stop itself is probably not covered by <u>Medina</u> or
21 <u>Romero</u> or <u>Wilson</u> or any of the Tenth Circuit cases.

22             MS. KENNEDY:  Exactly.  And all of those cases are
23 specific to excessive force SOPs, and we have other types of SOPs
24 at issue in this matter.

25             THE COURT:  Thank you, Ms. Kennedy.

1    Well, I'll start off with the good news, and that is that I

2    agree with you that with regard to the excessive force claim, that

3    cannot be based solely on a departmental policy violation.  That's

4    clear in the Tenth Circuit.  But what I hear Plaintiff saying is

5    that, really, they're concerned about the Monell claim and the

6    violation of departmental policies with regard to that issue,

7    which I don't see these cases covering.  And they also want to and

8    expect that there might be testimony about violation of policies

9    or procedures in the initial detention.  What do you make of that?

10   Does that change the way that you -- the breadth of the motion in

11   limine.

12        MS. RAHN:  Well, Your Honor, I didn't understand

13   Plaintiffs to be saying that Officer Whitten violated LCPD policy

14   in regards to the initial detention.  The point of their Monell

15   claim is that the LCPD actually caused that initial detention that

16   was unconstitutional.  So to the extent Plaintiffs intend to argue

17   that Officer Whitten's violation of LCPD's policy in regards to

18   the detention caused a constitutional violation, even outside the

19   use of force context, a violation of departmental policy does not

20   create a constitutional violation.  So I didn't understand the

21   Plaintiffs to be making that argument.  I think the Court's ruling

22   is clear, based upon the case law, that violation of department

23   policy cannot give rise to a constitutional violation and that

24   evidence should not be entered to make that argument, whether it

25   is an unlawful detention or an illegal arrest.  Because the

1    standard is objective reasonableness, reasonable suspicion, or

2    probable cause, all of which are objective, not subjective

3    standards, and do not turn on violations of policy.

4        So it sounds like we're clear on the first part in terms of

5    excessive force, but to the extent the Court intends to allow

6    Plaintiffs to make an argument that a violation of arrest policy

7    alone gives rise to a constitutional violation, it's the same

8    argument.

9        Ms. Kennedy -- I apologize if I was unclear -- read from not

10   the jury instruction that I was referring to.  The jury

11   instruction that I was referring to is proposed jury instruction

12   No. 24, which is page 32 of Docket No. 189.  It says, "Police

13   department guidelines do not create a constitutional right, but

14   they are relevant to the analysis of constitutionally excessive

15   force," which is actually directly in contrast with the cases

16   excluding that in this context.

17       So I want to address the Monell claim separately unless the

18   Court has further questions about whether or not the violation of

19   policy can give rise to a constitutional violation.

20           THE COURT:  Well, I just want to sort of really get down

21   to what exactly you're asking me to do.  Because reading the

22   brief -- and again you can throw prior counsel under the bus --

23   but it seems very broad what they're asking me to do.  So I'm

24   trying to really just get down to the nitty-gritty.

25       It sounds like, from what you've told me before, that you

1  want to exclude testimony about violation of departmental policy

2  as that pertains to the tasing and whether or not that was

3  excessive force, and now also with regard to the detention.  In

4  other words, you want to exclude any testimony that there was a

5  violation of policy and procedures that led to his detention that

6  was unconstitutional, therefore it was unconstitutional.  Those

7  are the two things that I see that you're asking me to do.  What

8  else?  I'm asking you this because I want to be able to analyze it

9  and make the appropriate ruling.

10          MS. RAHN:  Yes, Your Honor.  The Court correctly stated

11 the two requests for relief that we're asking for, which I think

12 can be summarized by stating we want to prohibit the Plaintiff

13 from making an argument that a violation of SOP creates a

14 constitutional violation or arguing that proof of the violation of

15 SOP, even if it's not sufficient to demonstrate a constitutional

16 violation, that it's relevant.

17     Let me address the Monell claim.  Your Honor, we have -- I'm

18 sure the Court noticed -- quite extensive objections to jury

19 instructions in this case.  We do not dispute that Plaintiffs pled

20 a Monell claim in regards to the allegation that Mr. -- that

21 Officer Whitten acted in accordance with either an official or

22 unofficial custom in regards to domestic violence investigation.

23 That is clearly asserted in the pretrial order.  It is the subject

24 of expert testimony, and so we do not argue that.  And so for that

25 particular purpose, the domestic investigations policy, rather, is

1  admissible, and they may make arguments regarding that policy.

2  We're not making an argument as to that.

3      In their response and also in the jury instructions they

4  proposed, Plaintiffs also made arguments regarding a Monell claim

5  in regards to excessive force.  As set forth extensively in the

6  briefing on the jury instructions, Defendants object that

7  Plaintiffs pled an excessive force Monell claim or that there is

8  sufficient evidence to instruct the jury on a Monell claim in

9  regards to excessive force.

10     As I noted in the briefing, one argument that Plaintiff made

11 in this case is that Sergeant Allen ratified Officer Whitten's use

12 of force.  In order to have a viable Monell claim for

13 ratification, it must be ratified by an official policymaker.  The

14 case law is clear, as set forth in the objections to jury

15 instructions, that Sergeant Allen is not a policymaker.  Plaintiff

16 did not introduce any evidence by which the Court could make that

17 finding, such as an organizational chart or testimony by a police

18 administrator, that sergeants hold enough power to be determined

19 as a matter of law to be a policymaker.  So Plaintiff's

20 ratification argument fails.

21     Plaintiff has argued here today that their expert's going to

22 say that Officer Whitten knew he could commit a constitutional

23 violation because he knew he wouldn't be disciplined for a failure

24 to either not follow policy or to not follow the law.  That is

25 not -- that's not a proper basis under Monell as what Plaintiffs

1    pled in regards to excessive force.  Plaintiff's other theory

2    regarding excessive force is that there's been a pattern of LCPD

3    incidents that have led to -- that puts the department on notice

4    that it needs to act in regards to excessive force.  That's

5    another argument that's made basically by submitting these jury

6    instructions.

7        However, there is insufficient evidence to support that

8    theory at trial.  So this motion in limine is actually tied up

9    into the arguments made in the jury instructions about what type

10   of _Monell_ claims can proceed to trial.  As I stated before, we

11   know there is a _Monell_ claim.  We're not disputing the idea that

12   there's a _Monell_ claim in regards to the detention of Mr. Price

13   pursuant to LCPD's policy regarding investigations.  However,

14   Plaintiffs did not make or plead or submit evidence to support the

15   other two theories in regards to excessive force, and that's -- we

16   also argue in our objections to the witness list that Mr. DeFoe's

17   testimony is inappropriate in this regard for numerous reasons.

18        THE COURT:  Why wouldn't I decide all that when we're

19   doing the jury instructions rather than now?  Because I don't see

20   this motion being that extensive.  This motion seems to be limited

21   to the use of the violation of departmental policies to show an

22   excessive force claim.  It doesn't seem to go really beyond that.

23        MS. RAHN:  Your Honor, I understand that that's what the

24   argument was, but Plaintiffs had argued against kind of the more

25   broad scope by saying there's other reasons by which the policy

 1    might be admissible.  So I agree with the Court's approach, that
 2    the Court can deal with this specific motion in limine by ruling
 3    on the request of the admission of SOPs to argue a violation of
 4    the Fourth Amendment in regards to excessive force.  And then I
 5    think it's quite intertwined with objections to witnesses and
 6    objections to jury instructions about what other <u>Monell</u> claims are
 7    viable and perhaps now is not the time to address all of that.
 8              THE COURT:  Thank you, Ms. Rahn.  Anything further or
 9    are you done?
10              MS. RAHN:  I don't have anything further, but it's --
11    the next motion's also mine, so unless you're going to allow
12    counsel to respond.
13              THE COURT:  Just really quickly because I'm still trying
14    to understand exactly what's at issue in this motion.  It sounds
15    like -- well, from the motion itself, the only issue is -- the
16    only issue raised here is whether the Court should exclude
17    evidence pertaining to the violation of departmental policies in
18    the tasing and in the detention to the extent that Plaintiff is
19    saying that led to a constitutional violation.  Correct?  That
20    seems to me to be the issue here.
21              MS. KENNEDY:  Correct, Your Honor.  The problem -- may I
22    just --
23              THE COURT:  Yes, please.
24              MS. KENNEDY:  I appreciate -- what we understand the
25    Court is leaning towards is a very, very limited granting of a

1  very, very broad motion that's difficult for us to understand.  I

2  mean, our response cites a case Tenorio v. Pitzer where Judge

3  Herrera allowed evidence concerning tactics available to officers,

4  such as warnings and techniques used to respond to the mentally

5  ill as relevant, not unduly prejudicial and admissible.  So we

6  just don't want the granting of this motion to limit Scott DeFoe's

7  testimony because there's been no Daubert motion filed.

8          THE COURT:  So this is -- and Judge Herrera's case dealt

9  with a Monell issue as well?

10          MS. KENNEDY:  Correct.  And in dealing with Monell, it

11  is admissible.  So the problem is we don't have a bifurcated case,

12  nor do we have a pure 1983 case, and that is why we're so

13  confused.  And just for the record, because counsel talked about

14  the other SOP, which is generally covered by this motion in

15  limine, which just covers all SOPs, she said that we shouldn't be

16  able to argue that that SOP caused a constitutional violation.

17  However, that's an overbroad reading when the SOP itself is

18  unconstitutional.  So our argument is that when the officers are

19  following an SOP that says you must detain someone, even when they

20  haven't committed a crime, that that SOP itself is

21  unconstitutional, contributing to the moving force and a violation

22  of his constitutional rights.  That's very different than the

23  Graham v. O'Connor cases.

24      So we just thank you for listening so I can clarify that

25  argument.  I understand that the Court may give a limiting

1  instruction, limited specifically to <u>Graham v. O'Connor</u> excessive

2  force Section 1983 against Officer Whitten.

3       THE COURT:  That's right.  I expect my order will be

4  limited to the issues raised in the motion and the specific issue

5  of whether departmental -- or the violation of departmental

6  policies can be used to show an excessive force claim, which is

7  supporting an excessive force claim.  I've read the cases and I

8  think I understand the law in the Tenth Circuit.  But I want to go

9  back and look at a couple of things that kind of crossed my mind

10  as I'm making these arguments now.  So I'll take this motion under

11  advisement and I will have a ruling on that as soon as I can.

12       I will let you know that I probably will not get to the

13  <u>Monell</u> claims on this particular motion because they're just not

14  raised and I didn't have time to -- I don't have briefing on that,

15  and I just don't see the need to go further.  I understand that

16  we're going to have to deal with some of those when we get to the

17  jury instructions, so we'll be back here doing that again.

18       So let's go on to the next motion for now.

19            COURT REPORTER:  Can we take a break?

20            THE COURT:  No.

21  Carmela wants to take a break.  Can we take a break here

22  for -- let's reconvene in about 15 minutes, so at about 12:25.

23  All right.  Thank you.

24  (In recess at 12:08 p.m. until 12:30 p.m.)

25            THE COURT:  All right.  It looks like we -- where did we

 1   leave off?  We had gone through -- I believe we had gone through
 2   Document 127, and now we are on Document 128.  This is Defendants'
 3   motion in limine regarding other incidents and lawsuits.
 4            MS. RAHN:  Yes, Your Honor.
 5            THE COURT:  Sorry.
 6            MS. RAHN:  I snuck up here when you weren't looking.  I
 7   assume you were calling me to the --
 8            THE COURT:  I was.
 9            MS. RAHN:  All right, Your Honor.  So in regards to this
10   motion, the scope of it has been narrowed, but because it is a
11   little nuanced, I do want to read into the record exactly what was
12   agreed to by the parties.  So Defendants had moved to exclude
13   other incidents or lawsuits involving the LCPD as part of this
14   motion in limine.  In Plaintiff's response, Plaintiff stated,
15   which is Docket No. 143, page 2, Plaintiff otherwise agrees that
16   other incidents and lawsuits are not admissible, which I
17   understood to be specifically to their relief in the record -- or
18   the relief requested in the motion would be incidents involving
19   the LCPD.  So when Plaintiffs respond, I just want to confirm that
20   that is what that assertion is to, with the exception of --
21   Plaintiffs qualified their agreement in two respects.  They
22   indicated that Defendant should be similarly restricted and
23   prohibited from referencing or insinuating they have not had other
24   excessive force incidents or internal affairs investigations.
25   Defendants are willing to make that stipulation.

1      And in addition, during jury selection, the parties should be

2   allowed to ask potential jurors about their views of law

3   enforcement officers, whether they know the identity of any

4   witnesses to the lawsuit, their involvement and views of Black

5   Lives Matter, Blue Lives Matter, social movements, and whether

6   they could be fair and impartial if selected.  I believe the Court

7   already ruled on potential supplemental juror questionnaires on

8   that issue and indicated, if timing-wise they could not be

9   submitted, that the Court would allow that in voir dire, as well

10  as potential additional time if that was necessary.  So the

11  Defendants do not object to that qualification as to other

12  incidents or lawsuits involving the Las Cruces Police Department.

13     So I don't know if the Court wants to have Plaintiff respond

14  now about that representation regarding what we're not disputing

15  in this motion.  Then I can turn to the part that's clearly

16  disputed.  Whatever the Court wants.

17          THE COURT:  No.  I think you stated what's not disputed

18  in this motion.  I think that's pretty clear.  Let's just go with

19  what is disputed.  I'll hear from Plaintiff after I hear from you,

20  Ms. Rahn.

21          MS. RAHN:  Yes, Your Honor.  So what is disputed in this

22  motion is reference to the George Floyd incident.  It's a

23  well-publicized incident where members of a police department

24  ended up being criminally charged for the death of an

25  African-American male in very heinous circumstances.

1    Plaintiffs argue, that even though that did not occur in New
2  Mexico, that there's no evidence that Officer Whitten was
3  specifically aware of or trained or had any duty to be aware of
4  that incident.  They want to argue in this case that the George
5  Floyd incident is relevant.  They want to reference it and they
6  want to question Mr. Price about it.  And they claim that it is
7  relevant for two things:  One, it goes to Mr. Price's state of
8  mind during the incident and why he did not comply with Officer
9  Whitten's commands to get on the ground.  It sounds -- I believe
10  during his deposition, Mr. Price testified that he didn't want to
11  get on the ground because he didn't want to end up like George
12  Floyd by placing himself on the ground, and it goes to his
13  emotional damages.
14    Under the Fourth Amendment, Your Honor, it is the objective
15  reasonableness viewed from the perspective of a reasonable officer
16  on-scene.  That is the perspective for both excessive force and
17  unlawful arrest and detention claims, which are articulated in the
18  briefing on the jury instructions in this case.  It is also the
19  standard under the state law claims that it is viewed from an
20  objective perspective of a reasonable officer.  Therefore,
21  Mr. Price's justification for why he did not comply with Officer
22  Whitten's commands is not relevant in this case.  And to the
23  extent it does have relevance, it's not -- and does have probative
24  value, that probative value is substantially outweighed by the
25  danger of unfair prejudice in arguing that Mr. Price was justified

1    somehow in not complying with Officer Whitten's commands or that
2    undermines Officer Whitten's objective view of Mr. Price's action.
3        In the briefing on the jury instructions, as well as the
4    briefing on the motion for summary judgment, we laid out the case
5    law from the Tenth Circuit, including <u>Wilson v. Meeks</u>, that the
6    Court is required to view the Fourth Amendment claims from the
7    perspective of a reasonable officer, and that an officer is not
8    required to know what is in the heart or mind of an assailant.  So
9    the first basis for Mr. Price arguing --
10       THE COURT:  Does that mean, then, that we can't get
11   testimony -- that he can't be asked at trial why he did something?
12   I'm talking about the Plaintiff.  I understand your point is
13   that -- and I agree with you, the law says that we look in
14   determining whether something was excessive or unreasonable, we
15   look at the viewpoint of the officer at the time.  But why would
16   we basically gag him, the Plaintiff, in not being able to explain
17   why he did certain things?
18       MS. RAHN:  Your Honor, it's important that Plaintiffs --
19   the theory of Plaintiff's case, as articulated in the response to
20   the motion, is not just that he wants to say this, but that his
21   actions were justified because of the George Floyd incident.  So
22   we do want a ruling from the Court that there is no reference to
23   the George Floyd incident.  We're not asking for the Court to
24   prohibit Plaintiff from saying why he didn't comply with commands.
25   Plaintiff's counsel should be prohibited from arguing that, as an

1  African-American male, of course Mr. Price didn't comply with

2  Officer Whitten's commands because he knows about George Floyd.

3  And that is -- it's the idea that his actions were justified by

4  the George Floyd incident and what happened there, is the basis of

5  this particular motion.  And Plaintiffs, that's what they wrote in

6  their response, is that they didn't -- that the George Floyd

7  incident actually justifies Mr. Price's actions.  So that's our

8  concern based on Mr. Price's response, is that that reference to

9  the George Floyd incident impacted the justification for

10  Plaintiff's actions in this case.

11      They also argue, Your Honor, that the George Floyd incident

12  is relevant to Plaintiff's damages.

13          THE COURT:  Okay.

14          MS. RAHN:  Your Honor, I can see that there is some

15  potential relevancy in regards to why this incident was so

16  upsetting because of Mr. Price's experience as an African-American

17  male in America in dealing with the police.  However, that

18  probative value is substantially outweighed by the danger of

19  unfair prejudice.  There is no evidence that that incident has

20  anything to do with the Las Cruces Police Department, and it's

21  clearly going to be used as a springboard to argue that the jury

22  should punish the police in this case because of the landscape in

23  which we live, including the George Floyd incident.  That is

24  unfairly prejudicial to LCPD.  We are not here to try the George

25  Floyd incident.  We're not here to dispute the findings made in

1   the criminal charges against Officer Chauvin.  That is not what
2   we're here to try.

3       Plaintiffs previously argued that this trial should not turn
4   into a mini trial of other incidences, and the Court appeared to
5   agree with that reasoning in regards to Mr. Price's other
6   experiences with law enforcement, that they weren't relevant to
7   this case.  So if Mr. Price's own previous experience with law
8   enforcement are not relevant in this case --

9           THE COURT:  I haven't ruled on that yet.

10          MS. RAHN:  Well, I understand, but that was Plaintiff's
11  argument.

12          THE COURT:  I get it.

13          MS. RAHN:  What I'm saying is that if you're going to
14  grant their motion, then our motion should similarly be -- I don't
15  know what the reasoning the Court's going to apply.  I recognize
16  the Court intended to present that.  But what I'm pointing out,
17  Your Honor, is the idea of attenuation, which was Plaintiff's
18  theory.  Those are Mr. Price's own interactions with law
19  enforcement.  How is an incident that has nothing to do with
20  Mr. Price, he wasn't involved, has nothing to do with Officer
21  Whitten -- or the Las Cruces police department, it is unfairly
22  prejudicial to make this case about the George Floyd incident.

23      Additionally, the facts are distinguishable.  That was an
24  incident where, over a prolonged period of time, an officer
25  suffocated the suspect.  That alone, Your Honor, is misleading in

1    regards to the facts of this case.  Officer Whitten did use force

2    against Mr. Price, but it was a tasing.  He was provided with

3    medical attention, and there was never a time where Mr. Price was

4    placed on the ground for an extended period of time, where Officer

5    Whitten sat on him or continued to exert force on him while he was

6    on the ground.  Plaintiff's theory of this case is that the use of

7    the taser was excessive.  There's never been an argument or an

8    opinion about that the manner in which Mr. Price was handcuffed or

9    how long he was on the ground was excessive.

10    By arguing the George Floyd case is relevant to this matter,

11    Plaintiff is implying that there are some sort of similar

12    circumstances in terms of the potential asphyxiation issue, which

13    is not a threat that has been raised in this case and is not an

14    issue that's been raised in this case.  So under 403, this also

15    bears the standard of confusing the jury.

16    Your Honor, additionally, in regards to the City of Las

17    Cruces, punitive damages are not available.  So trying to punish

18    the City of Las Cruces, anything to teach a lesson or to deter,

19    that is punishment, those are punitive damages.  So these

20    arguments only go to punitive damages in regards to the idea of

21    the general attitude towards police, not Mr. Price's compensatory

22    damages.  And to the extent that there's any probative value in

23    regards to compensatory damages, again, Your Honor, this is the

24    danger of unfair prejudice.

25    This is an extremely volatile issue.  It's not something that

1  the LCPD is responsible for, and it should not be introduced to

2  this case.  The Plaintiff can put on their case about this

3  incident without referring to something that happened across the

4  country in terms of both the liability phase of this case as well

5  as the damages phase.  Mr. Price would be free to testify to the

6  jury that he felt especially harmed as an African-American man.

7  I'm not asking to seek to exclude any of that.  It's just the

8  references to the George Floyd case.

9          THE COURT:  What if it was the case -- and it sounds to

10  me like he's already said something about -- or he's going to

11  explain why he didn't do something because he was, you know,

12  concerned about what happened to George Floyd.  If that's the

13  truth, why wouldn't the jury be able to hear that?

14          MS. RAHN:  Because it's misleading to the jury.  That is

15  not relevant to our legal standard.  Officer Whitten is not

16  charged with knowing that.  And by making that argument that

17  Mr. Price's actions were justified because he was scared, that is

18  not a defense.  There's no self-defense instruction in this case.

19  There is no --

20          THE COURT:  I'm not talking about making the argument.

21  That's different.  I'm not, at this time, talking about what

22  arguments Plaintiff's counsel can make with regard to George Floyd

23  case.  What I'm saying is that I don't see how I can prohibit the

24  Plaintiff from testifying about why he did something?  If it was

25  because George Floyd was on his mind, why wouldn't I allow that to

1    come in if that's exactly what he was thinking at the time?

2           MS. RAHN:  Your Honor is suggesting that because it's

3    true, it's admissible, and we're arguing that it's unfairly

4    prejudicial even if it's true and even if it's probative.  Because

5    of the volatile nature of that case and the attenuation between

6    that incident and what happened here, Your Honor, it's unfair to

7    LCPD.  We cannot justify or address the actions of Mr. -- of the

8    officers in the police department who dealt with that incident.

9    And so we're asking LCPD to be responsible for the sins of another

10   police department.  And I don't think the jury, even with a

11   limiting instruction, is going to be separating those issues.

12       What's the point of Mr. Price testifying that he didn't

13   comply because he was scared when those actions do not actually

14   create a Fourth Amendment violation?  And so we're very concerned

15   about the line that gets crossed with the type of evidence?  And

16   the specific reference to the George Floyd incident --

17          THE COURT:  But there's more than just the

18   constitutional violations here.  There's also state tort law

19   claims that are going to be tried, wrapped up into this.  How

20   would we preclude it under those claims?

21          MS. RAHN:  Your Honor, as I mentioned, a battery or

22   false imprisonment claim under the New Mexico Tort Claims Act are

23   still based upon the standard of objective reasonableness.  The

24   New Mexico state courts have not expanded that definition or

25   required -- require an inquiry into the suspect's state of mind

1    and said the officer is assessing the outward manifestations of

2    the suspect's actions.

3         So it is undisputed that when Officer Whitten told Mr. Price

4    to do things, he didn't do what Officer Price (sic) told him to

5    do.  His justifications for doing so do not create liability under

6    either the Fourth Amendment or state law claims.  There's no

7    separate standard under the state law claims.  They're still based

8    upon probable cause as an objective standard and objective

9    reasonableness.  And that's cited in the briefing on the jury

10   instructions, Your Honor, but the primary case under New Mexico

11   case law is Mead v. Connor.

12             THE COURT:  Thank you.

13             MCGRAW:  If I may go in reverse order and talk about the

14   George Floyd incident and that issue, and then talk about other

15   incidents.

16             THE COURT:  When you're talking about George Floyd

17   incident, you're talking about Plaintiff's counsel making

18   arguments concerning the George Floyd incident, or are you talking

19   about the Plaintiff being able to testify that he did something

20   because of the George Floyd incident?

21             MS. MCGRAW:  All of it.

22             THE COURT:  Because, again, I'm just trying to get down

23   to parsing out the arguments to very specific evidence that will

24   or will not be presented.

25        So what is it that you intend to say with regard -- or how do

1   you intend to use the George Floyd incident in this case?

2           MS. MCGRAW:  In answering Your Honor's question, I would

3   first start -- I would walk myself chronologically through trial.

4   It will come up in voir dire even if we don't ask it.  That's what

5   our focus grouping is telling us.  Jurors are aware of this.

6       We've just heard from Defendants who say Plaintiffs

7   incident -- Plaintiff says that Plaintiff's criminal incidents

8   that are so attenuated and not relevant, what's good for the goose

9   is good for the gander.  Those are not the same thing.  The jury

10  has no knowledge right now of Mark Price or any of his prior

11  history.  This jury that will walk into this courtroom, those

12  potential jurors, don't leave reality and their experiences at the

13  doors of this courthouse.  They're gonna walk in with knowledge of

14  George Floyd, of former Officer Chauvin being stabbed in a federal

15  penitentiary this last weekend.  That is in the media.  It is

16  something that we need to inquire and ask them about.

17      It doesn't mean because a potential juror has heard about

18  George Floyd that they're going to automatically side with

19  Plaintiff.  They could be very pro-officer in that line of

20  questioning.

21          THE COURT:  But that's voir dire.

22          MS. MCGRAW:  That's voir dire.

23      And so going into opening, there's -- it's hard for me to

24  actually honestly answer your question in this way because

25  I -- there's multiple areas where the George Floyd incident comes

1   in.  One is Mark Price's damages, and what was his state of mind
2   at the time.  But it is relevant also to what was in Officer
3   Whitten's state of mind.

4       The George Floyd incident and the other incidents involving
5   excessive force and deaths of Black people in this country at the
6   hands of law enforcement who have been given great power to
7   interact with citizens is relevant to the -- an objectively
8   reasonable officer in this day and age.  What I was -- I brought
9   up my laptop because I pulled up Officer Whitten's deposition, and
10  I'm going to get back to my point here, but I asked Officer
11  Whitten in his deposition what sensitivity training have you had?
12  He didn't know what I was talking about.  He said, I treat
13  everyone the same.  I said, Sure.  But what about religion?  What
14  about language, different races?  Have you been trained on any of
15  that in appreciating who you are encountering and how you may be
16  perceived.  This is relevant to CIT or crisis intervention
17  training.  It's relevant to how an officer is trained to
18  deescalate.  That is an officer's training.  That is what an
19  objective, reasonable officer should understand.

20      The issues at bay in this country that are involving law
21  enforcement, that testimony is relevant as to a number of things
22  with Officer Whitten.  One, he called Mark Price hostile.  What if
23  what you believe was hostility was actually fear?  And fear that
24  Mark Price will say because two months before this incident George
25  Floyd was ordered to get on the ground and killed as a result.  It

 1    is relevant that that is not only in Mark Price's state of mind,
 2    but it should also have been in the understanding and training of
 3    Officer Whitten or any objectively reasonable officer.
 4         The --
 5              THE COURT:  I don't -- I'm not understanding the
 6    argument about how this goes to Mark Price's state of mind, how
 7    the George Floyd incident would go to his state of mind in this
 8    case.
 9              MS. MCGRAW:  To Mark Price's or to the officers?
10              THE COURT:  I'm sorry, to the officer's.  I do
11    understand the Plaintiff's state of mind, but with the officer's
12    state of mind.
13              MS. MCGRAW:  Because the officer is not encountering
14    citizens in a vacuum.  He is encountering people in this country
15    who are from different ethnicities, different languages, different
16    races, different experiences.  And all of those experiences --
17    living in this country, we are colored by what we hear on TV, what
18    we learn.  And when you're hearing over and over again that
19    officers are engaging in wrongful conduct at an alarming rate with
20    Black people and you're a Black person, that's relevant.  And the
21    officer should have training and an understanding of that.  Who is
22    he encountering?  What is their experience?  What is their
23    background?  That's what sensitivity training is for an officer.
24    So that's why these incidents, George Floyd, Breonna Taylor,
25    whatever they may be, are relevant.

1       Now, I'm not -- we do not intend to make this case about

2    George Floyd, but George Floyd is relevant and those similar

3    incidents to both what the officer knew, how he failed to

4    deescalate and keep things calm.  One of them -- it is not a

5    deescalation to order a Black man to the ground two months after

6    another a Black man was killed after being ordered to the ground,

7    and that has not only made national news, it has roiled this

8    country with protests.

9       For that officer not to recognize that an encounter with a

10   citizen who is Black is -- does go to the objective reasonableness

11   of that officer and his encounter.  But it is also relevant to

12   Mark Price's state of mind for damages.  And I believe Your Honor

13   appreciates that.  I can make that argument again, if you'd like.

14   I don't mean that to be flippant.

15            THE COURT:  No.  No.

16            MS. MCGRAW:  I just want to keep going.

17       In addition, the jury needs -- I don't know -- we don't know

18   what the makeup of this jury will be, but understanding what it is

19   like to be a Black person who encounters a police officer is

20   directly relevant to the damages in this case.

21       The --

22            THE COURT:  Why can't that information be brought out

23   without regard or reference to a particular incident?  And I say

24   that -- they already know about George Floyd.  You stated that.  I

25   agree with that.  Everyone knows about George Floyd.  Why bring it

1  up in trial now rather than just asking the questions, making the
2  points you're making now or asking questions about the points that
3  you're making now without referencing the particular incident of
4  George Floyd?  Because that incident, while it involved a Black
5  man and police officers, as we do here, was very different than
6  this case.  There was -- it was basically a murder, which was
7  tragic and horrible and probably due to lack of training and all
8  of these things.  But the incident itself, I think the argument --
9  the 403 argument here is somewhat compelling because you're
10  talking about an incident that is far -- it's a terrible thing
11  that happened.  With the allegations here, if they're true and if
12  they're proven to be true, that was a terrible thing for the
13  Plaintiff to have gone through.  But -- and I'm just being honest
14  here -- I believe George Floyd went through a lot more and
15  actually died, was murdered.

16      That, to me, seems to get almost to an inflammation of the
17  jury.  The jury's going to be inflamed by this information.
18  They're going to start putting together George Floyd with this
19  case when really the facts aren't the same.  There's some
20  similarities to the extent that you're making allegations that
21  this might be related to -- there might be some intolerance here
22  or whatever it is that you're arguing.  But with regard to that
23  specific incident, I just have concerns about bringing it up.

24      MS. MCGRAW:  No, and I mean -- okay.  So to unwind and
25  go back in the history of this case, it's Defendants' motion in

1  limine that names out George Floyd.  And where that comes from is

2  Plaintiff Mark Price in his deposition explaining, I didn't get on

3  the ground because the George Floyd incident is in my mind.

4  Beyond that, we don't -- I don't feel the need to go into more

5  depth about the George Floyd incident.  I mean, Black man demanded

6  to get on the ground.  That's what he's testified to.  I can't

7  avoid that -- his testimony.

8          THE COURT:  And what would the relevance of that

9  testimony be when -- with regard to Section 1983 excessive force

10  claims, it is -- we're looking at the objective reasonableness

11  from the standpoint of the officer and what the officer knew at

12  the time.  Why would it be relevant what Plaintiff was thinking at

13  the time?

14          MS. MCGRAW:  No, I agree with you on that.  That it's

15  what is in -- but it's -- I agree with you to a part, because it

16  is the officer -- officers are trained on citizen encounters.

17  Citizens are not trained on police encounters.  What does that

18  training mean for an officer trained when they encounter citizens?

19  To have an understanding of the citizen and their background,

20  their viewpoint, what they may be experiencing.

21      So I am arguing to Your Honor that an objectively reasonable

22  officer should have, in their purview, an understanding of

23  societal events that have happened that may affect the way a

24  citizen they are encountering is acting.  I hope I'm articulating

25  that as clearly as I can.  But he should have knowledge of that

1  and that it may have an influence.  I'm not saying just the George

2  Floyd incident.  It's kind of a general, you know, all of these

3  incidents, because there's not a few of them.  There's numerous.

4      I don't see that there is -- I would beg this Court not to

5  restrict us from saying the word "George Floyd" because that is

6  what Mark Price was thinking of.  He has testified to that under

7  oath.  So I would ask that we not be stricken from saying that,

8  though I don't need to give a litany of all the incidents and all

9  names of the numerous Black lives that have been taken at the

10  hands of law enforcement wrongfully in this country.  That's not

11  what I'm doing.  I do not intend to do that.  I do believe -- and

12  I also believe from prior rulings from Your Honor, including the

13  supplemental jury questionnaire, that you recognize the need to

14  explore these topics in voir dire, to -- you know, where these

15  potential jurors lie on these issues.

16      But an objective, reasonable officer should deescalate, not

17  escalate a situation within two minutes and 32 second into a

18  tasing in the testicle with a firearm present.  There is no

19  appreciation for the fear that was being instilled in Mark Price.

20  There was no attempt to communicate or calm him down.  And,

21  repeatedly, Mark is being -- I mean, he's being accused of being

22  hostile or just an angry Black man, and that's really a broad

23  brush that doesn't appreciate his experience and what an officer's

24  training is to understand that and to kind of seek out that

25  information in their communication with the citizen they

 1  encounter.

 2      I've just been handed a note.  I'm just going to read it.

 3  The first thing a jury is going to ask is, why didn't Mark Price

 4  follow the officer's commands?  And the answer is, I was scared to

 5  get on the ground.  That is what Mark Price answered in his

 6  deposition, but he named the George Floyd incident.

 7      Also, this is -- it's relevant for comparative fault under

 8  the tort claims that we have as to who is responsible for the

 9  damages, assuming the jury is debating between Officer Whitten,

10  Sergeant Allen and LCPD under the tort claims that we have.

11  That -- these prior incidents are relevant to that.

12      If I may go into the other incidents portion of the MIL.

13  Defendant -- or did Your Honor have any other questions about this

14  topic?

15              THE COURT:  No, you can go ahead.

16              MS. MCGRAW:  Thank you.  I appreciate that Defendants

17  new counsel, Ms. Rahn, walked up to this podium and the first

18  thing she said or acknowledged was how vague Defendants' motion

19  was.  And it's really relevant also that prior counsel for

20  Defendants did not seek Plaintiff's position on any motions in

21  limine.  They just filed them.  What's the point of meeting and

22  conferring?  It's so that we can understand what you're asking.

23  And it has become clear to me there was not an understanding of

24  what was being asked to be excluded.  It was too vague.  And so we

25  do oppose the exclusion of other incidents and lawsuits against

1  LCPD.  I do not believe in my review that that was clear.

2      And what has come to light over time and in great part

3  because of my co-counsel joining in on this case is -- and in our

4  ongoing investigation, is one of the witnesses in this case is

5  Officer Abundis.  Officer Abundis had numerous use of force

6  incidents that went unchecked and undisciplined.  No reprimands to

7  him until they piled up and piled up and he was eventually fired.

8  Officer Abundis and Officer Whitten are academy mates.  They went

9  through the academy together at LCPD in 2017.

10     And Officer Abundis was present.  He actually took the photos

11 of the taser where the taser prongs were.  He pulled one of them

12 out with his bare hands.  And his conduct at LCPD is relevant to

13 Officer Whitten and Plaintiff's claims for punitive damages and

14 also our claim for negligence and also our claim for Monell and

15 our negligence claims.  These other incidents of excessive force,

16 including lawsuits pending against LCPD, show that LCPD's failure

17 to train, failure to discipline and supervise have emboldened LCPD

18 officers to violate the Constitution in multiple ways.  For this

19 reason -- and the City is ratifying that unconstitutional conduct

20 by continually failing to train, discipline and supervise.  They

21 know -- it's relevant to state of mind of Officer Whitten that he

22 knew his academy mate and actually himself that he wouldn't get

23 disciplined.  And he was correct.  He didn't get disciplined.

24     So we would ask that this Court allow us to discuss these

25 other incidents.  They would come in through Plaintiff's expert,

1    and also through impeachment in cross-examination of Officer

2    Abundis, Officer Whitten, and Officer Balderrama, and potentially

3    Sergeant Allen to see what his knowledge is as to these other

4    incidents.

5         THE COURT:  These other incidents involving -- here's

6    the problem:  I know it seems like when we have one motion in

7    limine that the Plaintiffs are filing or arguing for this sort of

8    limited view of relevance and we focus on prejudice and how it

9    overcomes the relevancy, and then on another motion we're doing

10   the opposite and we're saying that it should be included because

11   it's relevant.  It just seems to me like we're getting into -- I'm

12   just concerned about focusing on what's at issue in this trial.

13        You're saying that the evidence of other incidents involving

14   LCPD police officers is relevant to your Monell claim?

15        MS. MCGRAW:  Our Monell claim, our punitive damages

16   claim against Officer Whitten because it goes to his state of mind

17   and motive knowing that he wouldn't get disciplined, knowing that

18   it was, in essence, tolerated and more than tolerated based on

19   some of the language in the video.  So --

20        THE COURT:  Well, punitive damages isn't based on an

21   individual's state of mind.  It's based on their actions, whether

22   they were reckless or acted with reckless disregard or willful in

23   some way.  It doesn't seem to me like his state of mind would

24   really be something we need to be concerned about for punitive

25   damages.  I just don't understand that argument.

1    You're saying it's more likely that he was going to be
2    reckless or acted with reckless disregard because he knew he
3    wouldn't be punished for it?

4            MS. MCGRAW:  Yeah.  I respectfully disagree that
5    punitive damages do not call into play state of mind because they
6    run from reckless disregard all the way to intentional and the
7    jury weighs those.

8            THE COURT:  I guess I misspoke.  State of mind as to --
9    in the way that you're trying to put it together, saying that
10   because LCPD did not address other incidents, then somehow that
11   goes to his actions in this case being reckless or willful.  I'm
12   not making the connection yet, quite yet, that you're trying to
13   make with regard to the LCPD incident.

14           MS. MCGRAW:  Okay.  So the other incidents and lawsuits
15   are relevant to the municipality claim and the negligence claims.
16   It's also relevant to Officer Whitten -- the claims as to Officer
17   Whitten's punitive damages.  And that -- if I may just have a
18   moment.

19           THE COURT:  Yeah.

20           MS. MCGRAW:  I need to play this out in a hypothetical
21   to best explain it.  And I apologize -- I'm at a loss for words
22   here.

23       Officer Whitten knew that he would not be disciplined for
24   violating the Fourth Amendment, because none of his -- he hadn't
25   been prior and nor had his academy mates, witnesses in this case.

1    So, yes, that emboldens him to violate the Constitution.  I don't
2    have to comply with that policy.  They never enforce it.  They
3    never discipline.  It does go to his state of mind.  It does go to
4    his motive.  I -- if you -- I'm having a hard time articulating
5    it, but I do believe these prior incidents, and that LCPD is
6    actually tolerating these violations, is relevant to punitive
7    damages as well as Plaintiff's other claims.
8        A reckless disregard for the health and safety of others.
9    That's the basis for punitive damages.  Punitive damages are to
10   send a message.  And as my co-counsel has previously argued to the
11   Court this morning, is we would be asking the jury to send a
12   message to officers similarly situated to individuals like Officer
13   Whitten to deter their conduct because LCPD has not.  I do believe
14   it is directly relevant to punitive damages and it goes to state
15   of mind, motive, and deterring.
16            THE COURT:  Okay.  I think I understand what you're
17   saying.
18            MS. MCGRAW:  Okay.
19            MS. RAHN:  Your Honor, I recognize that there has been
20   some points of the briefing that were not clear, but I want to
21   read to the Court what Defendants asked for in their motion,
22   Docket No. 128, page 2.  Plaintiff may wish to introduce evidence
23   of other instances of alleged excessive force and unlawful arrest
24   and/or other lawsuits in which the Defendant officers, City of Las
25   Cruces, or the LCPD are or were named Defendants.  That is

1   directly from our motion.  That is the relief requested.

2       I read to the Court Plaintiff's response to that, which was

3   that we agree the other incidents and lawsuits are not admissible

4   with two exceptions.  If Plaintiff wishes to revise their position

5   in light of changed evidence or changed trial strategy, I imagine

6   that the Court could allow that, given that the Court has not yet

7   ruled on these motions in limine.  But it is unfair to suggest

8   that even -- that it was not clear from our original motion that

9   we were asking the Court to exclude evidence of other actions by

10  officers.  We've argued that that is not the kind of evidence that

11  is allowed under 404 and 403 Rules of Evidence.  Under both the

12  Section 1983 claim against Officer Whitten, as well as a _Monell_

13  claim against the City of Las Cruces, a pattern and practice of

14  excessive force is a viable theory of _Monell_ claim.  As set forth

15  extensively in our jury instructions, that's not what Plaintiffs

16  pled or supported here.

17      The only evidence that they want to introduce is the evidence

18  of Officer Abundis.  Officer Abundis was disclosed and treated in

19  this case, up until Ms. Kennedy's entrance, as an individual who

20  was -- whose testimony was relevant because he took photos of

21  Mr. Price.  That was his status as a witness through the entirety

22  of this case.  Then when Ms. Kennedy entered her appearance, she

23  then argued, based upon her knowledge because she's plaintiff's

24  counsel in the other cases against Officer Abundis, that Officer

25  Abundis's conduct in other cases would become relevant in this

case to establish a pattern and practice of excessive force
against the City of Las Cruces.  It is our argument in the jury
instructions that that was not pled clearly and not preserved in
the pretrial order, and the Court will rule at some point on the
jury instructions and whether or not those <u>Monell</u> claims are going
to trial.

But even assuming that the Court entertains an argument that
Plaintiff properly pled a theory of a pattern of excessive force
and a failure to discipline officers for excessive force, the only
incidences with Officer Abundis involving a taser occurred after
the incident with Mr. Price.  So their argument that Officer
Whitten on the day of this incident knew, because of Officer
Abundis getting away with it, that he wasn't going to get
disciplined, fails as a matter of fact because both of the
incidences involving Officer Abundis were after July 2020.  So
they could not have informed Officer Whitten's actions, nor could
they have informed the City of Las Cruces's failure to discipline
Officer Whitten for this use of force.

Additionally, Officer Abundis was terminated for one of those
incidences.  So the allegation that the tolerance for Officer
Abundis demonstrates a deliberate indifference or a pattern and
practice against the City of Las Cruces is again undermined by the
actual facts of those case.  For at least the second tasing, he
was terminated.  So that would not be relevant -- that would not
be relevant in this case because it would actually undermine

1  Plaintiff's argument.

2      I think the Court made an important -- many important

3  observations, but one especially important one that in regards to

4  Plaintiff's case, we're trying to try just this incident with no

5  reference to anything else.  But in regards to the Defendants, any

6  and every incident that's ever happened with police officers is

7  now relevant and probative and won't confuse the jury about the

8  standard in this case.

9      So to be clear --

10          THE COURT:  Well, except that it's a little different

11  from the Plaintiffs, because the Plaintiffs have the <u>Monell</u> claim.

12  So if the Plaintiffs only had the excessive force claim and it was

13  only about what happened that day with Officer Whitten and

14  Plaintiff Price and they didn't have state tort law claims, I

15  think it would be pretty easy to say that we can narrow this down.

16  But because of the <u>Monell</u> claims, state tort law claims, other

17  things that kind of play into this, it gets a little bit more

18  difficult to say that it should be that narrow.  So I'm trying to

19  just get through that right now.

20      And why wouldn't -- I guess explain to me again, why wouldn't

21  the other incidents that the Plaintiffs intend to present with

22  regard to LCPD excessive force claims be relevant here?

23          MS. RAHN:  Your Honor --

24          THE COURT:  Is it because you're saying that their

25  complaint doesn't sufficiently allege a pattern and practice of

1  excessive force?

2          MS. RAHN:  The pretrial order does not sufficiently

3  allege that.  And we also need to look at the witnesses that were

4  disclosed in this case, and we have to look at the fairness of the

5  Rules of Civil Procedure.

6      Officer Whitten was not questioned about other instances.

7  And, again, it was very clear from our motion that Officer

8  Whitten -- that we were seeking to exclude evidence of unlawful

9  arrests and excessive force in other lawsuits against the City of

10 Las Cruces.  Plaintiffs unequivocally agreed -- I apologize.  They

11 equivocally agreed to that, but those conditions are set forth in

12 their motion and they have to do with voir dire and arguing that

13 Defendants shouldn't be able to make a similar argument.  That's

14 clear from the briefing.  Recognizing that some of the motions are

15 broad, our relief was clear.

16     So my first argument is that they've already agreed that they

17 wouldn't enter those, which is now inconsistent with this theory

18 that Officer Abundis's instances give rise to a pattern and

19 practice.  But even if the Court were to allow, as a matter of

20 civil procedure, that those would come in, as a factual matter,

21 Officer Abundis's alleged excessive force after the incident

22 involving Mr. Price are not relevant to prove that LCPD's --

23 LCPD's failure to discipline Officer Abundis for tasings after

24 Officer Whitten are not relevant to this case.  They're not

25 relevant to a ratification theory which was not adequately pled by

1  the Plaintiffs.  They cannot have been the moving force behind the

2  violation.  Instead, what Plaintiffs are arguing is that after

3  this incident, LCPD continued to not discipline officers, which is

4  not probative of whether or not their actions in this case were

5  the -- their failure to discipline Officer Whitten in this case is

6  the moving force behind the policy violations.

7       So I do apologize, Your Honor.  I recognize that there is a

8  complicating factor of the _Monell_ claims.  But as a factual

9  matter, how can facts after -- incidents after the one at issue,

10  which is the only incident they can present first-hand knowledge

11  of in this case -- again, when we set forth our witness list, they

12  didn't present evidence of police reports or other issues of other

13  incidents as an exhibit.  They didn't try to set forth any

14  business records that document discipline or lack thereof, and

15  they didn't name anybody on their witness list in the higher chain

16  of command.

17       So the only supervisor that we have that's going to testify

18  at trial is Sergeant Allen, who is not in the chain of command who

19  can ratify the other officer's conduct.  Again, for the very first

20  time, Plaintiff's counsel said that they also intend to question

21  Officer Balderrama on whether or not he's ever been involved in an

22  excessive force incident.  That was not explored in discovery and

23  it wasn't disclosed in the pretrial order.  So at the very least,

24  Your Honor, I request that the Court either hold this motion in

25  abeyance or request that we voir dire the witness about these

1   instances.

2       If these are all going to be incidences that are either

3   distinguishable from the facts of this case so that the jury

4   should not compare them, or they occurred after the incident with

5   Mr. Price -- we, at this point, don't know exactly what incidences

6   Plaintiffs intend to introduce.  Again, there was no mention of

7   discussing this with Officer Balderrama in the pretrial order or

8   as a theory that Officer Balderrama had a pattern of excessive

9   force.  There was no allegation that Sergeant Allen had a pattern

10  of excessive force or Officer Whitten.  So we're kind of

11  blind-sided by them going to trial and just asking about other

12  instances.  If those are presented to the jury and then we object

13  and say, well, they're not relevant, Your Honor, because the facts

14  are distinguishable, the jury's already heard about them and we

15  can't unring the bell.  So the ones that we do know they're going

16  to bring up are factually irrelevant because they happened after

17  the incident with Mr. Price, even in regards to the Monell claim.

18  So that's in regards to specific incidences.

19      The Court has alluded, again, to the George Floyd incident.

20  There is nothing under state law that changes the analysis, that

21  is, the officer's perceptions of the suspect's outward

22  manifestations of their conduct, and there's nothing that change

23  that under the Monell claim.

24      In regards to the failure to train claim, I wish to point out

25  a few things.  Plaintiffs admit that the incident with George

1    Floyd occurred two months before the incident with Mr. Price, so

2    they're suggesting that LCPD somehow was required to prepare a

3    curriculum on that issue in two months.  They do not have any

4    testimony to support that.  As argued in our objections to the

5    witness list, Mr. DeFoe did not read any training materials in

6    this case before summarily concluding that Officer Whitten

7    received insufficient training.  He disclosed a list of the

8    documents that he reviewed, and he did not review any of the

9    training that was provided to Officer Whitten.  So under 702, they

10   have no competent evidence that there was a lack of training,

11   which is why we argue their negligent and failure to train claims

12   under federal law are not viable.

13        Again, Your Honor, I do apologize because the nature of the

14   evidence that's going to come in in this case is dependent upon

15   the theories that are going to be presented to the jury,

16   specifically whether the _Monell_ claims are viable and the various

17   theories under _Monell_, such as ratification, pattern and practice.

18   So they're intertwined with the jury instructions.  But, again,

19   Your Honor, it's very clear in this case that Officer Whitten's

20   previous use of force cannot be used against him to demonstrate a

21   constitutional violation, and they did not allege a pattern and

22   practice in regards to Officer Whitten in the pretrial order,

23   which is the governing document as far as the theories that will

24   go to the jury.

25             THE COURT:  All right.  Thank you, Ms. Rahn.

1          MS. RAHN:  Are you done with that motion, because again
2     the next one's mine, so I don't know --
3          THE COURT:  I want to get back to Plaintiff with a
4     couple of questions on this motion.
5          MS. KENNEDY:  Your Honor, may I address the Court in
6     relation to Officer Abundis and what --
7          THE COURT:  Sure.
8          MS. KENNEDY:  Thank you.
9     Counsel continually argues that Plaintiff has somehow failed
10    in their complaint and in their pretrial order to put the
11    Defendant City on notice of its claim that the City developed and
12    maintained policies or customs exhibiting deliberate indifference
13    to the constitutional rights of persons in Las Cruces, New Mexico.
14    It was a policy and/or custom of the Las Cruces Police Department
15    to not adequately supervise and train its officers regarding
16    citizens' constitutional rights.
17         THE COURT:  Slow down, Ms. Kennedy.
18         MS. KENNEDY:  So I'm reading from the complaint, Your
19    Honor.  Paragraph Count 5, Monell custom or policy, paragraphs 82,
20    83, 84, that allege deliberate indifference to the constitutional
21    rights and a practice and pattern thereof.  So the claim that they
22    somehow didn't know this was coming is just simply not true.
23    Moreover, the claim in the pretrial order that we failed to
24    allege the basis for the practice and pattern of constitutional
25    violations is likewise part of Plaintiff's contentions in the

1  pretrial order, page 5, page 6.  It says on page 5, the City of

2  Las Cruces ratified the unconstitutional conduct of officers by

3  failing to discipline officers engaged in the unconstitutional

4  detentions, arrests, excessive force, and malicious prosecutions.

5         So Scott DeFoe was hired and wrote a report and his report

6  alleges these things.  And his report was taken by Plaintiffs and

7  put in their contentions in the PTO.  And then he's identified as

8  a witness that he's going to testify pursuant to his report.  The

9  fact that prior counsel didn't depose Plaintiff's expert, Scott

10 DeFoe, is not Plaintiff's problem.  It's their problem.

11        Now, when I became counsel and realized Officer Abundis was

12 on-scene and tore out the fishhook from the testicle of Mark Price

13 and didn't report an excessive use of force, it was ironic and

14 paradoxical because he had just been terminated after multiple

15 tasings and after multiple uses of force against alleged victims

16 of domestic violence; one a man holding a ten-year-old child, one

17 a woman whose arm was broken.  Now, those are public records, no

18 confidential order, that could be used to cross-examine that are

19 admissions of a party opponent.

20        I have been involved in civil rights cases where officers

21 open the door, and they open the door and pretend like they don't

22 have knowledge of prior violations of excessive force.  That could

23 happen in this case.  There is a use of force form that was

24 incorrectly carried out.  Sergeant Allen and Balderrama are going

25 to admit on cross-examination that they have knowledge that

1  discipline goes up the chain of command to the chief of police.

2  This illusion that they're going to come into court and pretend

3  like policy makers wouldn't know or wouldn't be part of

4  disciplining officers for excessive force is an illusion.  That's

5  simply not how cross-examinations are going to go in this case.

6       So the argument that Ms. McGraw has presented in this motion

7  in limine was Plaintiff may seek to introduce evidence of other

8  incidents of police misconduct or alleged police misconduct, such

9  as the incident involving the death of George Floyd or the issues

10  involving the Albuquerque Police Department.  Well, what?  We're

11  supposed to know how to respond to that?  She's like, Well, no,

12  we're not going to.

13       So the allegation that somehow Ms. McGraw has changed tactics

14  is simply unfair.  It's also unfair for us to pretend like on

15  cross-examination during this trial that other incidents might

16  come up.  Ms. Rahn represents Officer Abundis.  She has

17  represented his excessive use of force that resulted in his

18  termination took place afterwards.  This is going to go to the

19  motion in limine on the Thin Blue Line, but he had multiple

20  incidents of misconduct, recklessness, that would have put a

21  reasonable police department on notice that he was a danger to the

22  community and he continued to work.

23       Also --

24            THE COURT:  This is Abundis you're talking about?

25            MS. KENNEDY:  This is Abundis we're talking about, but

 1   he is going to testify -- we don't know, and that's the point.

 2              THE COURT:  But if Abundis -- if the incidents with

 3   Officer Abundis came after the incident with the Plaintiff and

 4   Officer Whitten, how is that relevant even to your Monell claim?

 5              MS. KENNEDY:  Well, many of them came before, Your

 6   Honor.

 7              THE COURT:  Many of what came before?

 8              MS. KENNEDY:  Of the bad acts of Officer Abundis.  I

 9   take dispute with her representation to the Court that all of the

10   unconstitutional tasings took place after 2020.  I believe one

11   took place in 2016.  One took -- I don't have the timeline in

12   front of me.  I think we could argue that in relation, you know --

13   I think I could present to the Court my anticipated

14   cross-examination.  And I presented it to Ms. Rahn because I said,

15   you know, do you have a conflict once again?  And she got a waiver

16   of the conflict from Officer Abundis.  So this is something we

17   have been arguing about in the context of jury instructions.  But

18   I'm not prepared to argue about Officer Abundis in detail today

19   because of -- this motion in limine doesn't address it.

20              THE COURT:  All right.  Thank you, Ms. Kennedy.

21         Here's the problem that I see with this motion in limine.

22   And I know, again, this wasn't something that you did, Ms. Rahn,

23   because this was prior counsel on this case.  But they did not --

24   it does not appear like there was any discussion or conference

25   with the Plaintiff before this was filed.  So it seems to me like

1  there was some miscommunication on exactly what the scope of this
2  motion is.

3      Hearing today, just sitting here listening for the last hour,
4  the arguments that were made, none of them -- very few of them are
5  actually spelled out in this motion or in the response simply
6  because I think we were just two ships passing in the night.  So
7  I'm going to deny the motion as it stands right now, but I am
8  going to allow -- and, actually, I'm going to ask and order that
9  the motion be refiled with specific incidents that the defense is
10  requesting be excluded and responses from the Plaintiff regarding
11  those specific incidents.

12      I just think there's too much here.  I was thinking to myself
13  that I'm going to have to go back and read this entire transcript
14  to figure out the arguments and actually the issues that are at
15  play.  I don't think I need to be doing that.  I think that's the
16  parties' burden.  So to the extent this is still going to be an
17  issue, I just need to -- the Court needs more information as to
18  exactly what the incidents are and the basis for wanting to bring
19  them in.

20      With regard to the George Floyd incident, I'm not going to
21  restrict voir dire in this case -- I think I've already ruled on
22  that -- with regard to these types of cases that have been in the
23  media.  With regard to testimony at trial or openings or closings,
24  I will make a ruling as to the limitation on any reference to
25  instances that are not involved here.  I'll have to go back and

1  take a look at that to determine whether or not it is appropriate

2  to limit the Plaintiff's testimony regarding why he might have

3  done something on that day.

4      I understand the argument that as far as excessive force

5  claim under 1983, we look at the officer's perspective to

6  determine what was objectively reasonable.  But, here, we have

7  tort law claims.  We have comparative fault that might be an issue

8  as well.  And to the extent that we have those issues, the Court

9  will likely not preclude mention of the George Floyd incident if

10  that's the testimony that we get from the Plaintiff regarding that

11  issue.  I'll lay that out more in an order, but I likely will

12  preclude some, Plaintiff's counsel, by anyone, regarding the

13  George Floyd incident, but I'll have to go back and look at the

14  parameters of that to determine what's appropriate.

15      So, basically, I guess what I'm doing here is I'm denying in

16  part and granting in part the motion -- I'm sorry, I'm denying the

17  motion in limine.  With regard to the George Floyd incident, I'm

18  granting in part and denying in part as I just stated.  But I am

19  asking that the parties readdress the specific incidents and

20  lawsuits that would be the subject of this motion in limine.

21      And since we're on a time frame here, I'll ask that that

22  motion in limine be refiled within the next ten days, and then

23  we'll go on the regular briefing schedule thereafter.  And I

24  probably will not have argument.  Assuming that the parties are

25  able to be specific about the incidents and lawsuits and the

1   reasons why they should be excluded -- again, I would say that I
2   don't need introduction.  I know what everybody's position is on
3   what happened that day.  I don't need the introduction or the
4   background.  I just need you to get to the incidents and why the
5   defense is asking for them to be excluded.  And the Plaintiffs --
6   and why Plaintiffs believe it's appropriate to bring in these
7   other incidents and lawsuits.  And I probably won't have a hearing
8   on that, another hearing.  I probably will just decide it on the
9   supplemental briefing.
10       Going on to the next motion, it looks like the next one would
11   be 129, which I think is now moot, so I'll deny that motion in
12   limine.
13       Then we have Defendants' motion in limine -- have we gone
14   through all the Plaintiff's motions in limine?
15           MS. MCGRAW:  Yes.
16           THE COURT:  Now we're on the Defendants' motion in
17   limine with regard to Thin Blue Line, Blue Wall of Silence or
18   similar concepts.
19           MS. RAHN:  Your Honor, Defendants' motion specifically
20   requested that Plaintiff's counsel refrain from mentioning Thin
21   Blue Line or Blue Wall of Silence.  In their response, Plaintiff's
22   counsel indicated that they did not oppose that specific request
23   unless Defendants opened the door in some way, which I anticipate
24   they could re-approach and argue that at trial, that that was
25   changed.

1    The Defendants' motion also said similar concepts, and

2  Plaintiff said that they could not address that because it was too

3  vague.  At this point, Defendants are not asking for any other

4  specific phrases to be restricted.  And so I don't know how the

5  Court wants to handle that, is me withdrawing that portion of the

6  motion or I guess the Court can grant in part and deny in part the

7  motion in limine.  But I understand Plaintiff's argument that

8  similar concepts was too vague.  I also think it's too vague for

9  the Court to rule on at this point.  So we're just focusing on the

10 two specific phrases we ask Plaintiffs refrain from saying during

11 trial.

12    THE COURT:  Thank you, Ms. Rahn.

13    Ms. McGraw?

14    MS. McGRAW:  The jury will be instructed that argument

15 of counsel is not evidence.  It's a jury instruction.  A jury

16 instruction goes back to the jury.  In closing arguments,

17 Plaintiff should be able to discuss the Thin Blue Line, the Blue

18 Wall of Silence, and other concepts.

19    In addition, these concepts may likely come up in voir dire

20 by the potential jurors.  Plaintiff -- and this touches on the

21 motion we were just arguing at length which is evidence of other

22 officers and sergeants not speaking up and calling out Officer

23 Whitten for his misconduct and instead allowing it and encouraging

24 it.  And those are relevant.  Those are the way we intend to

25 approach some of the claims that we have going to the jury.

1       So we would ask that we -- that a gag order not be placed on
2  us as to these -- the Thin Blue Line and the Blue Wall of Silence.
3  I do not foresee us asking -- using those phrases necessarily with
4  specific officers.  It may come up with Plaintiff's expert
5  witness.  So I suspect it will come up in voir dire, Plaintiff's
6  expert witness testimony, and in closing, which is argument by
7  counsel.  And I'd ask that we not be restricted from using these
8  phrases.
9       Do you have any questions?
10          THE COURT:  No.  It sounds like you're somewhat changing
11  the position that you have in response.
12          MS. MCGRAW:  I am.  Frankly, I am.  Part of it is
13  because the claim -- these motion in limines were written when we
14  were -- we didn't have MSJs decided.  Those weren't determined
15  until over a month later.
16       And so the -- we would like to talk about the fact that no
17  one at the scene, not Officer Balderrama, who on the video, the
18  body worn camera video, it's a pretty startling moment.
19  Immediately after Balderrama runs up and handcuffs Mark Price
20  who's on the ground being tased for a prolonged period, he has a
21  quick conversation with Officer Whitten.  And he says -- and
22  Officer Whitten says -- and he's kind of replaying what happened.
23  So I see him walking up on the side and I grab him.  Officer
24  Balderrama goes, You grabbed him?  And he says it just like that.
25  He was alarmed that Officer Whitten is saying he grabbed him.  But

1  did he speak up?  Did he say that was wrong?  No.

2      Then Officer Whitten goes to speak with Sergeant Allen, and

3  there is no calling out, You tased him in his testicles.  Look at

4  that.  The use of force form shows the circle, the no strike zone.

5  That's where he tased him.  All of these things are relevant

6  because they all remain silent.  It goes to that -- it supports

7  Plaintiff's <u>Monell</u> claim and our tort claims, negligence claims,

8  against Officer Allen and the City.  It also -- and so I believe

9  it's relevant.  And as to that conspiracy of silence, I am,

10  frankly, yes, changing our position.

11          THE COURT:  All right.  Thank you.

12          MS. RAHN:  Well, I didn't know that till now, Your

13  Honor.

14      You know, there -- previous counsel's briefing may not have

15  been clear, but our arguments have been consistent with counsel's

16  previous briefing.  Counsel explicitly stated a position.  We've

17  made arguments and planned evidence and argued jury instructions

18  around that.  And it becomes difficult in this case as theories

19  have changed.  I recognize that these motions in limine were filed

20  in August.  Our jury instructions were prepared somewhat later.

21  But in a civil case, in federal court, there are rules of decorum

22  and there are procedures that have to be followed.  We can't just

23  change the theory of case midstream, and we can't just change our

24  positions midstream.  And that's part of the arguments in regards

25  to the jury instructions, is what claims actually go to the jury.

1      We don't argue that Plaintiff -- so in this regard, it is --

2    there's no specific information that Ms. McGraw just described

3    that was not available to them when they wrote their motion.  The

4    lapel cam, Officer Balderrama's response to Officer Whitten's

5    statement, even accepting Plaintiff's characterization of that

6    interaction, that's been on lapel cam since July of 2020.

7      I'm concerned, Your Honor, by statements regarding ongoing

8    investigations and continued discovery, which was made earlier

9    today in this hearing is that there are ongoing investigation.  We

10   are locked in to the theories of this case.  We are locked in to

11   the witnesses that are in this case and their disclosed basis of

12   their testimony.  So again, Your Honor, this is a theme that is

13   emerging.  Recognizing I didn't write the briefs in the other

14   cases, I can't change what they put in the briefs.  I can clarify

15   the arguments and I've abandoned some arguments that no longer are

16   appropriate in light of the facts of this case and the law, but

17   what Ms. McGraw just described is a situation that she's known

18   about since you watched the lapel cam.  So that's very concerning.

19     But in regards to the allegation of the Wall of Science, it

20   is not relevant to the claims in this case.  Plaintiffs are

21   arguing a few different things.  First, in regards to a _Monell_

22   claim, under Section 1983, the failure to discipline an officer in

23   the underlying incident is insufficient for a _Monell_ claim.  So

24   when she says that it's -- the fact that everyone sat there and

25   didn't say anything, that does not support a _Monell_ claim.

1    Officer Balderrama, again, is not a policymaker.  So ratification
2    at the Monell level requires actions of a policymaker.  So
3    Plaintiff's frustration about Officer Balderrama not doing
4    anything about Officer Whitten does not create any liability under
5    the Monell claims, either ratification or policy and practice,
6    because those need to be incidents that occurred before in order
7    to establish a pattern.
8         In regard to the state law claims, in regards to negligent
9    supervision, there is not a negligent supervision claim against
10   Officer Balderrama.  He's not a supervisor.  There's not an
11   allegation that Sergeant Allen knew about Officer Balderrama's
12   statements in making the decisions regarding Officer Whitten.  And
13   under state law, the negligence that an officer engages in has to
14   cause an underlying violation.  Sergeant Allen's failure after the
15   fact to discipline Officer Whitten could not have caused the
16   violation in this case.  So I just want to note that this theory,
17   this conspiracy of silence, is just an attack on witnesses's
18   credibility in general.  It's not -- it does not create liability
19   for any specific claim in this case.  There is no claim for not --
20   pled against Officer Balderrama for failing to stop Officer
21   Whitten, and they've disagreed to dismiss the failure to intervene
22   claim against Sergeant Allen.  So all we have is a failure to
23   supervise ahead of time that caused this constitutional violation
24   or the battery in this case.
25        So the Court needs to understand that this conspiracy, this

1    code of silence, this Thin Blue Line, does not go to liability.
2    Instead it goes to credibility.  Plaintiffs want to argue that
3    cops stick together and cops lie.  That is just an attack on
4    witness credibility that is unfairly prejudicial and is not
5    supported by the evidence in this case.  And Plaintiffs are free
6    to ask Officer Balderrama if he felt Officer Whitten -- or if he
7    tried to stop Officer Whitten or whatever they want to ask
8    Balderrama.  But Plaintiff's suggestion that motions in limine or
9    the Court's instructions about the things that counsel can say in
10   opening and closing, that the Court has no control over that
11   simply because statements by counsel are not evidence, is untrue.
12       There is multiple citations in the briefing of the Court
13   saying counsel's statements are inappropriate.  For example, in
14   their motion to prevent unnecessary attacks by -- on counsel, they
15   cited several -- Plaintiffs cited several cases that said counsel
16   in closing argument arguing that other counsel was lying was
17   something that should have been excluded.  So this idea that
18   everything's okay to say in opening and closing because it's not
19   evidence and the jury knows that is undermined by the case law
20   that they have cited and their own motion in limine that sought to
21   limit defense counsel from making certain arguments.  Motions in
22   limine are not limited solely to evidence.
23       So in short, Your Honor, very concerned about the change in
24   position because it's not based upon a change in evidence that was
25   unforeseeable at the time that this briefing was set forth.

1  Again, Defendants, in fairness, limited to their request for
2  relief for the two specific things we asked for Plaintiffs not to
3  say, and now that's being changed.  I didn't ask the Court to rule
4  on similar references because we recognized that was vague.  But
5  the two specific things we asked for, we understood were not
6  opposed.
7      References to the Thin Blue Line and Blue Wall of Silence are
8  prejudicial because their probative value does not go to any
9  specific claim in this case.  And we ask that the Court exclude
10 references, both in testimony and in counsel's arguments, to Thin
11 Blue Line and Blue Wall of Silence.
12     THE COURT:  Thank you, Ms. Rahn.  Let me hear from the
13 Plaintiff again.
14     It does make it a little difficult to get through this motion
15 in limine when you've changed your position on it before the
16 hearing.  But at least we know now that your position is
17 different.  But what is the relevance of -- I understand what the
18 Thin Blue Line and Blue Wall of Silence are and those kinds of
19 things that are mentioned.  But what evidence do we have here of
20 there is this conspiracy of silence that led to or is relevant to
21 what happened to Mr. Price?  More specifically, give me the -- how
22 you intend to bring up the Thin Blue Line or the Blue Wall of
23 Silence.
24     MS. MCGRAW:  Okay.  I will do that.  First, I'd like to
25 apologize to the Court and to defense counsel for not being --

1    getting on this sooner.  I don't mean to excuse my conduct in

2    failing to do that, but I will say, when I work with different

3    counsel, there's different approaches and as things have changed

4    quite a bit in this case over the last few months.  So please

5    forgive me, please, that I was not more forthright in our change

6    of position on this one.

7          So the Thin Blue Line and the Blue Wall of Silence are

8    relevant.  It goes to Plaintiff's <u>Monell</u> claim that the -- that

9    goes to -- which is based on failing to train, discipline and

10   supervise when policies are violated.  So that would be under the

11   <u>Monell</u> as to Sergeant Allen and the other tort claims -- under the

12   Tort Claims Act, we do not need to specifically name officer

13   Balderrama as a defendant.  He's an agent of the City of Las

14   Cruces.  His actions in failing to speak up, Sergeant Allen's

15   actions in not only failing to speak up and say -- question this

16   conduct --

17          THE COURT:  Was there prior conduct by Officer Whitten?

18   It would be easier for me to see the relevance of this if Officer

19   Whitten had engaged in similar -- or there was an allegation that

20   he engaged in similar conduct in the past and nobody did anything

21   about it or said anything about it.  I'm not exactly sure where --

22   again, I'm trying to pinpoint out how you would be using the terms

23   or the phrases Thin Blue Line or Blue Wall of Silence here.

24          MS. MCGRAW:  Yes.  I have a timeline of Officer

25   Whitten's prior misconduct.  Frankly, I cannot tell you right now

1  what date that occurred on, and so I apologize.  But it -- so
2  your -- I see what you're saying, though, because you're saying
3  everything you're pointing to is after the fact, and I hear you on
4  that.  But there was no -- but it is relevant that this culture
5  created at LCPD is to keep silent and to say, hey, Buddy, that's
6  how it rolls, good job, even though they know that there was a
7  violation that he was tased in the testicles.  No one stopped and
8  said, Wait, we can't take him to the prison because he didn't calm
9  down -- or not prison, jail.  Or why are we taking him to jail?
10 No one --

11         THE COURT:  To me, Ms. McGraw, that's not the same --
12 that concept, what you're talking about, can be brought out, I'm
13 sure, at trial.  You can ask questions about that when those
14 witnesses testify.  You can cross-examine them about why they
15 didn't say something.  But that's different than the Thin Blue
16 Line or Blue Wall of Silence.  To me, those are concepts about,
17 you know, officers lying to protect another officer or doing
18 something.

19         MS. MCGRAW:  I do believe we have evidence of that, Your
20 Honor.

21         THE COURT:  Okay.  Where is that?

22         MS. MCGRAW:  In the body-worn camera footage, one of the
23 officers -- the officers are wearing gaiters, those masks, so it's
24 hard to tell who they are.  He taps his chest.  When they do that,
25 what they're saying is I'm on camera.  Okay?  He does that at one

1    point when they're -- in essence, they're kind of pooled around

2    each other making fun of Mark Price as he's in the vehicle

3    screaming and upset.  A lot of it occurs during Whitten's exchange

4    with Sergeant Allen where he -- Officer Whitten tells Sergeant

5    Allen there were multiple 911 hang up calls.  No one ever hung up

6    on 911.  That's a misstatement.

7        At the very -- and there's a few things in there.  I don't

8    have the transcript in front of me.  I can grab it and give you

9    more particulars for each one.  At the end of the video, Officer

10   Whitten walks to his vehicle and Sergeant Allen then follows after

11   him.  And I'd like to question Sergeant Allen about why he tells

12   Officer Whitten, Be really detailed in your report and make sure

13   you do this, this and this.  What's going on there?  Why are you

14   telling him to do that?

15       There was an implicit encouragement to cover up what had

16   happened and the constitutional violations that had occurred on

17   Mark Price's property to him and to which other officers who

18   respond to the scene should have really been asking more

19   questions.  That supports this -- the negligent claims as well as

20   the Monell claims.  And if you'd like more specifics, over a

21   break, I can give that to Your Honor, of the specific --

22           THE COURT:  I'm just trying to figure out why you would

23   even need to use the phrase Thin Blue Line or Blue Wall of Silence

24   here.  That's all.  It just seems to me like that's the only thing

25   that the defense is moving to exclude reference to those two

 1  things, and I just don't --

 2          MS. MCGRAW:  I believe at trial there will come out

 3  inconsistencies in these officers' statements and in things that

 4  have happened in their history with LCPD that will go to their

 5  credibility.  And those lines, Thin Blue Wall of Silence and

 6  the -- the Thin Blue Line and the Blue Wall of Silence -- I just

 7  mashed them.

 8          THE COURT:  Going to credibility and bias, I take it?

 9          MS. MCGRAW:  Yeah.

10          THE COURT:  But that's after they've testified, you

11  believe you will have that evidence?  You'll be able to present

12  that to the Court?

13          MS. MCGRAW:  I may be able to, yes.  I mean, that's why

14  I said I think it would go -- it's voir dire, potentially

15  Plaintiff's expert witness, and then in closing.  I --

16          THE COURT:  All right.  Well, then -- okay.

17          MS. MCGRAW:  I just -- I can't -- I mean, I do believe

18  those go and will come into play.  But for me to give you specific

19  particulars beyond what I'm trying to do, it's really -- I would

20  ask that if Your Honor feels uncomfortable at this time with these

21  phrasings, that you take this matter under advisement and we can

22  re-approach before we use these words, if that's where we are.

23  Because I do believe we would use them in very specific instances

24  that we can approach beforehand.

25          THE COURT:  Thank you, Ms. McGraw.

1    And I think that makes sense to the Court.  I'm not going --

2  I'm going to hold this motion in abeyance until trial.  And at

3  trial, if we get to the point where the Plaintiff intends to

4  reference Thin Blue Line or Blue Wall of Silence, I'll hear

5  argument from the parties on the appropriateness of that.

6  Hopefully that will be after we have some evidence at trial, and

7  it can be easier for me to make a determination on that.

8    All right.  The next motion is No. 131, Defendants' motion in

9  limine to prohibit distortion of jury instructions and the law.

10    MS. RAHN:  Your Honor, again, this is a motion that have

11  portions that I do not believe are fleshed out enough that the

12  Court can rule on this issue.  So, again, I want to clarify and

13  streamline what the Court -- rather the Defendants are asking the

14  Court to rule on today.

15    THE COURT:  All right.

16    MS. RAHN:  In the motion, Document No. 131, page 2, the

17  Defendants specifically ask that Plaintiff be prohibited from

18  making golden rule type arguments.  We also specifically ask on

19  page 3 to prohibit -- pages 3 and 4, to prohibit the Plaintiff

20  from arguing safety as a reason for their verdict in this case.

21    The general references to the reptile theory are

22  insufficiently fleshed out for Defendants to ask the Court for a

23  ruling at this time.  We do not waive objections to those types of

24  arguments.  But we will simply have to present them at trial based

25  upon how the testimony shakes out.  So hopefully the Court

1    appreciates that we're attempting to streamline this issue and

2    just asking to rule on the two points just mentioned.

3        Does the Court have any questions regarding that?

4        THE COURT:  No.  Obviously, there's case law regarding

5    the golden rule as it applies to damages.  What cases do you have

6    for the -- that would give me the ability and the authority to

7    preclude mentioning safety as a reason for a verdict?

8        MS. RAHN:  Your Honor, I do not have any -- well, I do

9    actually have cases regarding the issue of safety, and they are

10   cited on page 4, which is -- of our brief, Docket No. 131.

11   They're obviously just persuasive authority, which is Woulard v.

12   Green Motor, lines -- again, the citation in the record at page 4.

13   It's WestLaw 2019 WL 3318467.  It's a Southern District of

14   Missouri case from 2019.  The other issue -- or the other case

15   cited is Brooks v. Caterpillar Global Mining.  And that's 2017 WL

16   3401476, which is a Western District of Kentucky case from 2017.

17       THE COURT:  And I misspoke because I actually read these

18   cases.  But in addition to these cases, none of which are

19   obviously binding on the Court and are unpublished cases, do you

20   have any Tenth Circuit precedent that would help us with regard to

21   the motion in limine regarding the reptile tactics?

22       MS. RAHN:  No, I'm not advancing a general motion in

23   limine on reptile tactics.  Specifically, the argument of the word

24   "safety," that the jury won't be safe unless they award a verdict

25   against Officer Whitten.  I believe that's unfairly prejudicial --

 1   or we argue that it's unfairly prejudicial and it's also confusing
 2   for the jury.
 3        The law regarding whether or not Officer Whitten violated
 4   Plaintiff's constitutional rights will be set forth by the Court.
 5   In regards to the punitive damage instruction -- to the extent
 6   that the Court entertains one and allows one based upon the
 7   evidence, given that the Court deferred ruling on that until
 8   evidence comes out at trial -- the purpose of punitive damages is
 9   to deter conduct and to punish the individual for their conduct.
10   Arguing that nobody in the world will be safe unless we punish
11   Officer Whitten is beyond the scope of what a punitive damages
12   instruction is and the Court should be left to instruct the jury
13   on punitive damages.
14        I don't disagree with the Court that the golden rule or the
15   cases cited by Plaintiff in regards to the golden rule are
16   specifically in regards to damages.  However, based upon our
17   earlier discussion, the -- so we agree that they cannot make a
18   golden rule argument in regards to damages.  But under the
19   substantive law regarding Fourth Amendment claims, they also
20   cannot make a golden rule argument as to Mr. Price's motives
21   dictating the outcome of this case because of the perspective of a
22   reasonable officer.
23        And going -- we recognize that there's certain arguments or
24   certain tactics that counsel may want to entertain that are
25   wrapped more in a gray area and we can't predict before trial, but

1    if counsel intends to tell the jury to not follow the substantive

2    law regarding Fourth Amendment claims and say, You should look at

3    whether Mr. Price thought he was doing the right thing to decide

4    whether or not Officer Whitten violated his constitutional rights,

5    that's actually directly contradictory to the law in this case.

6    So it's not speculative.  It's not too big for the Court to rule

7    upon, because the Court's going to explicitly instruct the jury

8    that you view probable cause and reasonable suspicion and

9    excessive force and a battery claim under state law from the

10   perspective of a reasonable officer.  So asking the Court to --

11   making a golden rule argument in the liability phase is

12   inappropriate, and it's clearly inappropriate in the damages phase

13   as noted by the cases cited by Plaintiff.

14        So again, Your Honor, those are the only portions of the

15   motion that we are asking the Court to give an affirmative ruling

16   on, recognizing that the idea of reptile theory generally is too

17   big at this point for the Court to rule upon.

18             THE COURT:  All right.  Let me hear from Plaintiff on

19   this.

20             MS. KENNEDY:  When Ms. McGraw tried the case in front of

21   Judge Gonzales in Beck v. Baker, the basis of our -- the majority

22   of our jury instructions on liability, she was able to argue the

23   golden rule in relation to liability insofar as officers who

24   violate the Constitution are unsafe.  And Scott DeFoe will testify

25   that one of the reasons officers are trained to uphold the

1  Constitution, to deescalate situations, is that immediate
2  escalation endangers not only citizens, it endangers other
3  officers.  It's called officer-induced jeopardy.  So we will be
4  arguing that safety is an important consideration when it comes to
5  objectively-reasonable conduct of officers.

6        And the case law that supports the golden rule on the
7  liability phase of the objection -- objective reasonable analysis
8  is cited in Plaintiff's reply brief that the golden rule is
9  permissible when it comes to issues of liability, Cordova v. City
10 of Albuquerque, which is a Tenth Circuit case of 2017, 816 F.3d
11 635 at 660.  And Honorable Judge Gonzales again in the matter of
12 Rivera v. Volvo Cars, in which he allowed Plaintiff to address the
13 golden rule for purposes of liability in closing arguments.

14       So that is the way in which we anticipate Plaintiffs will
15 argue the golden rule insofar that, on liability, officers who do
16 not act in an objectively reasonable way and escalates situations
17 are endangering not only the constitutional rights of this
18 individual but all of our constitutional rights.

19       The rest of the motion in limine, again, we appreciate that
20 they withdrew the portion on reptile as we are completely confused
21 as how it would apply to the facts of this case.

22           THE COURT:  Thank you, Ms. Kennedy.

23       I think I understand the issue here.  I'll hold this motion
24 under advisement as well.  It is usually not the -- the Court
25 usually does not have rulings that attempt to restrict arguments

1   by the parties, either party.  So I'm going to go back and take a

2   look at some of the case law here that's been cited.  I think

3   everyone's on the same page regarding the golden rule on damages.

4   I'm not sure whether we need a pretrial motion on that or a

5   pretrial order on that given that we all know the rule and we're

6   all professionals in this courtroom.  So I want to go back and

7   take a look at the motion.

8       But to be honest with you, Ms. Rahn, right now, I just don't

9   see the merit in it, and it's likely that I'll deny the motion.

10  But I'll go back and take a look at what you've said.  It may be

11  that I change my mind.  I just want to make sure that we don't

12  have -- I'm not hamstringing anybody at trial from making

13  arguments.  At the same time, I don't want to be allowing improper

14  arguments based on things that might be outside the evidence or

15  outside the relevance of this case.  So I'll also hold that motion

16  in abeyance for now.

17      Is that the last motion in limine?

18          MS. RAHN:  Yes, Your Honor.

19          THE COURT:  Oh, great.  Just in time for lunch.

20          MS. MCGRAW:  Your Honor, if I may, will you be issuing a

21  ruling on Docs 120 and 121 today?

22          THE COURT:  Yes.

23          MS. MCGRAW:  Those are the criminal -- the prior

24  incidents.

25          THE COURT:  Let me go back to those.

1        This is with regard to Document 120, the opposed motion in

2   limine to exclude reference to Plaintiff's history with NMSU and

3   NMSU police, and 121, opposed motion in limine to exclude any

4   reference to Plaintiff's prior interactions with the criminal

5   justice system, the Court's going to grant both of those motions.

6   The Court doesn't see the relevance of the Plaintiff's history

7   with NMSU and NMSU Police, nor the relevance of his prior

8   experiences with the criminal justice system.

9        To the extent that they might be minimally relevant -- and

10  the only reason they would be relevant, possibly, is to show some

11  bias on the part of the Plaintiff -- I think that is sufficiently

12  and substantively outweighed by the danger of unfair prejudice to

13  the Plaintiff in this case.

14       I've read the case cited by the defense.  This is the Maples

15  case.  It's an unpublished case by one of my colleagues here on

16  this Court.  I have to say with regard -- for the most part,

17  there's nothing inconsistent in that district judge's decision

18  other than allowing defendants in that case to elicit testimony

19  about the number of past police encounters the plaintiff had and

20  whether those encounters involved the Albuquerque Police

21  Department.  And there was also a ruling that allowed the

22  defendants to inquire into past incidents in which the defendant

23  allegedly fled from officers if the plaintiff contended that he

24  believed he could walk away from officers when asked to speak with

25  them.

1    With regard to those two decisions by the district judge in
2    that case, to the extent they're inconsistent with my ruling, I
3    have to respectfully disagree with the analysis in that case.  I
4    think that Rule 403 overcomes the minimal relevance that those
5    prior instances with police and the prior instances or prior
6    interactions with the criminal justice system would have in this
7    case.  So I'm going to go ahead and grant both of those motions in
8    limine.

9    Anything else with regard to the motions in limine that I
10   need to address?

11            MS. MCGRAW:  Can we just double-check real quick?

12            THE COURT:  Yes, please.

13   Ms. Rahn, if you could also.  I don't know if I missed any of
14   your motions.  I think I got them all.

15            MS. RAHN:  I didn't understand that you intended to
16   offer any additional ruling on any of my motions today, Your
17   Honor.

18            THE COURT:  Right.  I think there's a couple that I have
19   in abeyance.  I'll hold those in abeyance until just before trial
20   or during trial.

21            MS. MCGRAW:  I believe you've covered everything with
22   regard to the motions in limine.  Thank you, Your Honor.

23            THE COURT:  I also wanted to apologize to the parties.
24   I see that we have other things that we should be deciding pretty
25   soon, which are objections to trial exhibits, also some jury

1    instruction issues.  I have not read through this material, so we
2    did not note those for hearing today, but I anticipate that if
3    we -- obviously, everyone knows there's a lot up in the air right
4    now, but if we move forward in January, I will probably be setting
5    a hearing to hear those last remaining motions and objections
6    prior to trial.

7        Anything further from either one of you?  Ms. Rahn?

8        MS. RAHN:  Your Honor, I guess there's one issue on the
9    docket that has not been addressed.  I just want it noted for the
10   record.  May I approach?

11       THE COURT:  Please.

12       MS. RAHN:  Back in May, the Defendants filed a motion to
13   extend the deadline for filing a Daubert motion.  That motion was
14   fully briefed and it was originally set for hearing when you
15   converted the trial setting on 9/11 to a motions hearing, and it
16   didn't get reset when we ended up having the hearing on 9/25 for
17   the -- for the dispositive motions hearing and then it technically
18   wasn't a motion in limine.  So it has not been heard.  It's been
19   fully briefed since July.

20       We did not file a Daubert motion, as Ms. Kennedy noted,
21   because we had asked to extend the deadline for the -- for a
22   Daubert motion.  I just wanted to flag for the Court the fact that
23   we converted several settings to motions hearing, and we kind of
24   limited those -- the scope of those at different times.  The Court
25   has not ruled on our motion to extend the deadline for filing a

1  Daubert motion.

2          THE COURT:  The request for the extension, did that come

3  after the deadline had passed?

4          MS. RAHN:  Yes.

5          THE COURT:  I think my intention was to deny the motion.

6          MS. RAHN:  Okay.

7          THE COURT:  And so I'll issue an order on that as well.

8          MS. RAHN:  Okay.

9          THE COURT:  For that reason.

10      Anything else from the Plaintiff?

11          MS. MCGRAW:  No.  Thank you.

12          THE COURT:  All right.  And thank you for bringing that

13  to my attention, Ms. Rahn.  I did not realize that we had not

14  ruled on that yet.  But I'll --

15          MS. RAHN:  I'm just helping the Court with its six-month

16  list.

17          THE COURT:  What's that?

18          MS. RAHN:  I'm just helping the Court.

19          THE COURT:  You are.  You are.  Thank you very much.

20      All right.  There being nothing further from the parties, the

21  Court will be in recess.  Thank you, all.

22  (Court concluded at 1:59 p.m.)

23

24

25

```
1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW MEXICO

3    _____
                                     )
4    MARK PRICE,                     )      No. 20-CV-01099-DHU
              Plaintiff,             )
5                                    )
          vs.                        )
6                                    )
     FRANCIS WHITTEN,                )
7    THADDEUS ALLEN, and             )
     THE CITY OF LAS CRUCES d/b/a    )
8    THE LAS CRUCES POLICE           )
     DEPARTMENT,                     )
9              Defendants.           )
     _____)

10

11              CERTIFICATE OF OFFICIAL COURT REPORTER

12        I, CARMELA V. MCALISTER, CRR, RPR, CMRS, New Mexico CCR #306,
     Federal Official Realtime Court Reporter, in and for the United
13   States District Court for the District of New Mexico, do hereby
     certify that pursuant to Section 753, Title 28, United States
14   Code, that the foregoing is a true and correct transcript of the
     stenographically reported proceedings held in the above-entitled
15   matter on November 28, 2023, and that the transcript page format
     is in conformance with the regulations of the Judicial Conference
16   of the United States.

17        Dated this 30th day of December 2023.

18

19   Carmela V. McAlister

20
     _____
21   CARMELA V. MCALISTER, CRR, RPR, CMRS, NM CCR #306
     United States Court Reporter
22   333 Lomas Blvd., NW
     Albuquerque, New Mexico  87102
23   Phone:  505-348-2094
     Email: carmela_mcalister@nmd.uscourts.gov
24

25
```